HELLE ET AL., APPELLANTS, *v.*
LANDMARK, INC., APPELLEE.

(No. L-83-342—Decided
March 30, 1984.)

Mr. Gerald B. Lackey and Mr. Mark C. Abramson, for appellants.

Mr. Richard S. Walinski and Mr. Stephen M. Dane, for appellee.

HANDWORK, J. This case is before the court on appeal from a judgment of the Lucas County Court of Common Pleas, which granted summary judgment in favor of defendant-appellee, Landmark, Inc.

Appellants, Virginia Helle, Winfred Jacobs and William Phillips (hereinafter Helle, Jacobs and Phillips or appellants), initiated this litigation against appellee, Landmark, Inc. (hereinafter Landmark), on September 13, 1982. Their complaint alleged that Landmark, as their employer, breached an oral contract to pay them severance benefits after it closed its business in August 1982. The complaint further alleged that the benefits were to be paid according to years worked with Landmark and on the condition that appellants remain with the company until closing. After filing its answer, Landmark moved to dismiss the complaint under Civ. R. 12(B)(6). Appellants responded with an amended complaint, alleging, in essence, breach of an oral contract and promissory estoppel. They also moved for summary judgment.

The trial court, treating Landmark's motion to dismiss as one for summary judgment, see Civ. R. 12(B)(6), granted the same on September 19, 1983. The trial court found that no material facts were disputed and that Landmark was entitled to judgment as a matter of law. This appeal followed.

The material before the trial court consisted of the pleadings, the interrogatories and answers thereto, the depositions of Helle, Jacobs, Phillips, and Loyal Rupp, a former area representative for Landmark.[1] Having independently reviewed these materials, we agree with the trial court's general conclusion, in which all the parties concur, that the pertinent facts are uncontroverted.

Phillips, Jacobs and Helle became employees of Lucas County Landmark (hereinafter LCLM) in 1954, 1963 and 1968, respectively. LCLM, before March 1979, was a countywide agricultural association having local offices in Maumee, Curtice and Berkey, Ohio.

[1] In support of certain factual statements in its brief, Landmark refers us to the deposition of Paul Schumacher. His deposition, however, appears nowhere in the material comprising the record sub judice. Consequently, in our review of this case, Landmark's references to and reliance upon Schumacher's deposition for factual support of its legal arguments will be disregarded. See App. R. 9.

LCLM marketed its various products and services through the county branches. Appellants worked at the Curtice office.

Under a management agreement with Landmark, LCLM received the services of a local manager to run the Curtice facility. While responsible to the local board of directors for day-to-day business, the LCLM manager was generally supervised by Landmark's area representative, Loyal Rupp. (The record indicates that an area representative, such as Rupp, was an intermediate liaison between county associations and Landmark's Columbus headquarters.)

As their depositions indicate, throughout their entire employment with LCLM, Helle, Jacobs and Phillips (and, apparently, other employees) believed that Rupp had the authority to make representations on behalf of Landmark about employment issues, and that his statements or directions were to be understood as those made in a supervisory capacity. Appellants viewed his authority as superior to that of the county manager, a point Landmark does not contest.

With the economic downturn in the late 1970's, LCLM began experiencing financial problems. Specifically, the record discloses that the association had difficulty repaying certain bank loans. Thus, in late 1978 and early 1979, the local board of directors of LCLM initiated take-over negotiations with Landmark. In April 1979, Landmark formally acquired LCLM as a corporate subsidiary (a "retail" outlet of Land-

mark), and LCLM thereafter became known as Curtice Landmark, Inc.

In March 1979, an employees' meeting was held at the Curtice facility to discuss the consequences of the take-over. The depositions indicate that Rupp told the employees (including appellants) about LCLM's change from a local association to a corporate subsidiary of Landmark. During this meeting, he also told the employees that "everything would remain the same" as far as their employment was concerned. The depositions of Helle, Jacobs and Phillips all indicate that specific questions were asked regarding vacation, health insurance and sick leave benefits, and that Rupp assured appellants that nothing regarding those benefits would be changed.[2] However, severance benefits were not discussed at this meeting.

After Landmark's take-over in 1979, nothing changed in the employees' jobs or the management of day-to-day operations at the Curtice facility. Rupp continued as area representative, but he apparently acquired a more enhanced supervisory role after the acquisition. In the summer of 1981, Landmark decided to begin "phasing out" operations at its Curtice office, with the ultimate goal of closing it completely. Although appellants had heard rumors that the Curtice facility would be shut down, it was not until September 1981 that Paul Schumacher, then the Curtice manager, actually informed the employees, and, in particular, Phillips, that the company would be closing its doors.

Landmark maintained a Personnel Policies and Practices Manual which described benefits and conditions of

---

[2] Jacobs testified that Rupp used a blackboard to itemize each retirement benefit and to emphasize that they would "be the same as in the past." Jacobs further testified that Rupp also stated, "Things will be even better," apparently meaning that Landmark's employment conditions would be an improvement over those prevailing under LCLM. This is consistent with appellants' testimony that they perceived the take-over as a good idea, one that would ultimately inure to their benefit as experienced employees.

employment for retail employees and which was distributed to and kept by all Landmark retail managers. In August 1981, Landmark established for the first time a severance plan for its employees and promulgated the same in the manual. According to Landmark, the purpose of the severance policy was to provide monetary benefits to non-union employees (such as appellants) whose employment with Landmark might suddenly end if its work force were reduced or its retail facilities shut down.

In early October, Rupp was apparently transferred elsewhere. Before leaving, however, Rupp assured the employees that they would receive substantial severance benefits when Curtice Landmark closed. In late October or early November, an individual from Landmark's Columbus headquarters, Chuck Hiegle, came to the Curtice office and informed the employees that the facility would continue operating for another year. At about this time, Jacobs and Phillips were told by Hiegle and Schumacher that the maximum paid vacation allowed to Landmark employees was three weeks, not four weeks, as had been the case with LCLM.

Although Rupp told appellants about the severance policy in September 1981, the record also indicates that appellants did not actually *see* copies of the manual's severance provisions until later. Phillips first saw copies of the severance provisions in December 1981. Jacobs first saw the manual in February 1982 in Schumacher's office after a con-versation with Hiegle. Helle did not see copies of the manual until March 1982.

The relevant portion of the manual relating to severance benefits is as follows:

| "Completed Years of Service | Weeks of Separatior Allowance |
|---|---|
| 180 days but less than 1 year | 1 week |
| 1 to 3 years | 2 weeks |
| 3 to 5 years | 3 weeks |
| 5 to 10 years | 5 weeks |
| 10 to 15 years | 5 weeks plus 1½ weeks for each completed year of service over 10 years |
| 15 years and over | 5 weeks plus 2 weeks for each completed year of service over 10 years" |

In August 1981, the manual's definition of the phrase "completed years of service" included an employee's previous years of employment with a local association, such as LCLM.[3] Landmark's manual also contained a reservation (or "disclaimer") clause, although some question exists as to when, precisely, it first appeared in the manual. The reservation clause states:

"The Landmark retails reserve the right to change or rescind, in whole or in part, at any time and without liability to anyone, the policies, principles and practices stated in this manual."

---

[3] In August and December 1981, the severance provisions of the manual contained a subsection entitled "Definitions," which, in pertinent part, stated:

"B. *DEFINITIONS*

"1. *EMPLOYEE* means a permanent, full-time employee of Landmark, Farm Bureau and Subsidiary Company.

"2. *SERVICE* will include employment with Landmark, Farm Bureau Local Land-marks and Subsidiary Companies for those years since the subsidiary was acquired by Landmark or Farm Bureau."

The manual also contained a subsection entitled, "ELIGIBILITY FOR SEPARA-TION [*i.e.,* severance] ALLOWANCE," which states, in part:

"1. The Allowance provided by this Policy will be granted at the sole discretion of the Company."

After initially learning of the severance policy, and knowing that Landmark intended to close the Curtice facility sometime in 1982, Phillips and Jacobs approached Schumacher and Hiegle, seeking more information about their benefits. Schumacher was apparently surprised to learn that Rupp had not furnished copies of the manual to the employees. Phillips testified that Schumacher contacted Landmark's Columbus headquarters to "verify" the severance policy. After doing so, Schumacher stated to him, "You'll have it. Loyal Rupp should have given you the papers on it [the severance provisions] already." Phillips further testified that Schumacher stated, "You can't afford to change jobs. It would be foolish."

Jacobs' account of the matter is even more explicit. He testified that he was contemplating looking elsewhere for work at the time he asked Hiegle and Schumacher about the severance policy. Jacobs expressed concern about the Curtice office closing down, to which Hiegle responded: "Don't be hasty about quitting [your] job and going to another job." Hiegle then took Jacobs to the manager's office and explained the severance policy to him. The following day, Schumacher called Jacobs to his office and made copies of the three pages in the manual containing the severance provisions. (The record indicates that Helle and Phillips also acquired copies of these same severance provisions.)

As Jacobs described his reaction to the severance provisions:

"When I seen [sic] the Manual, I knew what I was supposed to get, or at least I stayed on that job expecting to get that many weeks.

"* * *

"I thought they [Curtice Landmark] was closing, and I was concerned about

it. And that's why I went back originally to ask him [Hiegle], you know, if it was closing. That's when they — they didn't want me to quit at that time. That's what they didn't want me to do. They took me in the office and showed me all this stuff.

"* * *

"He [Schumacher] showed me, 'you've got twenty years.' He pointed out for me, for ten years, you've got so many weeks, and after that, you've got so many weeks per year. He pointed out for me. He said, 'You're going to be up there.' He said, 'The place might never close.' He said, 'Don't be too hasty. Besides, you can't afford to give this up. It's not like we'll come in here, and you'll be out in the street.' That's what he told me."

In December 1981, Landmark unilaterally amended the severance provisions to limit severance pay to a maximum of thirty-five weeks for employees with "completed years of service" over twenty-five years.[4] In late June 1982, a second amendment was issued for incorporation into the manual, but the record reveals that the Curtice manager did not receive anything in writing until August 2, 1982. This amendment redefined "completed years of service" to mean *only* those years of employment with Landmark, and *not* previous years of employment with local associations, such as LCLM. This meant, in effect, that *only* appellants' employment with Landmark since the 1979 take-over (*i.e.*, three years) would be counted in calculating any severance pay they received. Appellants were never told until later about this amendment.

In early July 1982, the employees received a letter from Hiegle stating that within a month the Curtice office

---

[4] This amendment, dated December 11, 1981, changed the category of "15 years and over" to "15 years to 25 years," and then added the thirty-five week capping provision mentioned in the text of the opinion.

would be closed. On July 7, an employees' meeting was held at which appellants were told what their benefits would be. When Jacobs and Phillips realized that the severance pay they thought they would receive had been reduced to three weeks, they approached Hiegle. According to Phillips, Hiegle stated that Curtice employees had been employed with Landmark for only three years, and thus severance pay was limited to three weeks. Hiegle explained that Jacobs' twenty years of employment with LCLM was not included under Landmark's present severance policy because "that was for a different company." When Phillips and Jacobs told Hiegle about their understanding of the computation of severance pay, based upon the earlier representations, Hiegle responded: "Well, the [severance] policy's been changed [and] you should never have been told that." Helle discovered the change in policy only after returning from her vacation in August.

In late July 1982, Hiegle contacted Jacobs and Phillips to discuss their severance pay dispute. Both men testified that they met Hiegle in a restaurant. Apparently, the meeting was quite brief. Jacobs described it thusly:

"I met him [Hiegle] at a restaurant, me and Bill Phillips. The subject [of severance pay] came up. Again, I showed him the two pages [from the manual] he gave me originally. I told him I was still upset about my severance pay. He said, 'You had no right to have those papers to start with.' He got up and walked away from the table, and that's the last time I seen him [sic]. I said, 'You was in there, too, and your manager was the one that made the copies and give the [sic] to me.' I says, 'I'm still upset about it,' and he got up and left.

Appellants subsequently filed this action, seeking to recover the amount of severance pay they would have received under the manual before the June 1982 amendment.[5] In bringing this appeal, appellants present five assignments of error for review, the first, second and fourth of which are:

"I. The court below failed to consider the complete and undisputed facts when it found no evidence of a promise by defendant.

"II. The court below erred in failing to find a valid contract of employment between the parties.

"IV. The trial court erred in finding that defendant's manual was illusory."

I

In support of these assignments of error, appellants argue that the trial court ignored evidence that Landmark, either through its manual or its agents, held out the promise of substantial severance benefits in return for appellants' continued employment with Curtice Landmark until it closed, thereby creating an enforceable contract right to those benefits. In its brief, Landmark responds with several arguments, but its principal argument is as follows:

"Any ruling that any employer can become legally and permanently bound by expressions of policy in its employment manual would directly contravene the 'at will' doctrine, for employers could no longer terminate their employees unless they complied with such manuals as if they were employment contracts. An employee manual arguably gives rise to a great many expectations on the part of employees, not the least of which is the expectation of continued employment. * * * Under the 'at will' doctrine, the * * * [appellants]

[5] The record reveals that after Landmark closed, appellants each received three weeks of severance pay. Jacobs and Phillips received only three weeks of vacation pay.

here could have been terminated by * * * [Landmark] one month before the Curtis facility was closed and appellants would have been entitled to no separation benefits at all. It is untenable and illogical to hold * * * [Landmark] to a greater liability simply because it chose to retain * * * [appellants] until the last possible moment."

This argument suffers from two deficiencies. First, since appellants were told, either directly or indirectly, that Curtice Landmark would be closed within a year, their employment relationship ceased to be one terminable "at-will" and, instead, became one for a reasonably specific or reasonably determinable period. More important, however, is the fact that this case does *not* involve the characteristic dispute over *termination*, usually the focal point of litigation under the employment-at-will doctrine. See *Henkle* v. *Educational Research Council* (1976), 45 Ohio St. 2d 249 [74 O.O.2d 415]; see, also, *Day* v. *Good Samaritan Hospital and Health Ctr.* (Aug. 17, 1983), Montgomery App. No. 8062, unreported. Hence, *Peterson* v. *Scott Constr. Co.* (1982), 5 Ohio App. 3d 203, and similar cases, are distinguishable.[6] This case, by contrast, arises from Landmark's refusal to pay severance benefits, a form of deferred compensation for continued service, and thus the issue presently before us entails an analysis based upon contemporary *contract* theory.

Second, even if this were an employment "at-will" case, Landmark's argument would still lack merit. It is no answer to say that employers cannot become contractually bound by their mere "expressions of policy," oral or written,

because then arguably they could no longer freely terminate their employees. This is, indeed, a non sequitur. In *Pine River State Bank* v. *Mettille* (Minn. 1983), 333 N.W. 2d 622, the Minnesota Supreme Court recently rejected a similar contention, stating at 628:

"It should not be necessary for an employee to prove a contract is of 'permanent' employment or for a specified term in order to avoid summary dismissal *if the parties have agreed otherwise. There is no reason why the at-will [doctrine] * * * needs to be construed as a limit on the parties' freedom to contract.* If the parties choose to provide in their employment contract of an indefinite duration for provisions of job security, they should be able to do so." (Emphasis added.)

We find this reasoning persuasive. The parties' freedom to contract as they see fit should not be circumscribed by an asphyxiative construction of the "at-will" doctrine. This is especially true when the employer's promulgation of policy statements, manuals, handbooks and the like, have instilled in the employee legitimate expectations of benefit in return for his continued service and loyalty. Thus, in holding that an employer's statements of policy can create rights enforceable in contract, the Michigan Supreme Court eloquently identified the "trade-off" implicit in the dissemination of such material:

"While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an

---

[6] *Peterson* v. *Scott Constr. Co.* (1982), 5 Ohio App. 3d 203, is also distinguishable on another ground. The issue there was whether Ohio law mandated an implied contractual duty not to discriminate on the basis of sex in employment contracts terminable at will. The

*Peterson* court held that since contracts of employment for an indefinite term allow employers to discharge employees for *any* or no reason, there is no implied duty in such contracts to be gender neutral. See *id.,* at 205.

orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair and are applied consistently and uniformly to each employee. *The employer has then created a situation 'instinct with an obligation.'*" (Emphasis added; footnotes omitted.) *Toussaint* v. *Blue Cross & Blue Shield of Michigan* (1980), 408 Mich. 579, 613, 292 N.W. 2d 880, 892.

Here, assuming an employment-at-will relationship, it is not necessarily true that Landmark could have denied appellants their severance benefits by "terminating" their employment one month (or even one day) before closing the Curtice facility, for this assertion merely begs the *contract* question. Thus viewed, the "at-will" concept is only a *description* of the parties' *prima facie* employment relationship. It intimates nothing about subsidiary contractual arrangements (express or implied) to which an employer may legally obligate himself by adding to that relationship new terms and conditions. Consequently, an increasing number of jurisdictions (including Ohio), in employment-at-will cases, have held that the employer's promulgation of employment manuals or employee handbooks, or other writings styled "personnel policies and practices," can create contractual rights which the employer may not abridge without incurring liability. See, *e.g.*,

*Hedrick* v. *Center for Comprehensive Alcoholism Treatment* (1982), 7 Ohio App. 3d 211; *Day* v. *Good Samaritan Hospital and Health Ctr., supra; Pine River State Bank* v. *Mettille, supra; Weiner* v. *McGraw-Hill, Inc.* (1982), 57 N.Y. 2d 458, 443 N.E. 2d 441; *Toussaint* v. *Blue Cross & Blue Shield of Michigan, supra; Cleary* v. *American Airlines* (1980), 111 Cal. App. 3d 443, 168 Cal. Rptr. 722.

When such oral or written modifications of the original employment contract satisfy the paradigm elements essential to contract formation — *i.e.,* offer, acceptance, consideration — binding obligations arise. Given this perspective, the present contractual analysis is ill-served by mechanical references to the employment-at-will doctrine.

## II

## A

The primary issue, as the trial court observed, is whether an offer or promise was made, since without it appellants cannot recover on either a contract or a promissory estoppel theory.

To become binding, a promise or offer need not be in writing — an oral representation, whether denoted as a "promise," "offer," or "proposal," is sufficient to bind the party in the position of the promisor if accepted by the putative promisee and supported by consideration. See 1 Restatement of the Law 2d, Contracts (1981) 14, Section 4. As the facts clearly show, numerous representations were made to appellants, at various times, by Rupp, Schumacher and Hiegle, all of whom Landmark concedes were its authorized agents. While we generally agree that "[n]ot every utterance of an employer is binding," see *Pine River State Bank* v. *Mettille, supra,* at 630, the nature and tenor of the various oral statements, beginning with those made at the March 1979 meeting and following, demon-

strate a promissory intention.[7] As only one example, we observe that in September 1981, after learning that Curtice Landmark would be closed in the following year, appellants were first told by Rupp that severance benefits were available.[8] As Jacobs described it, Rupp stated:

"Whatever you do, when they do close, *don't quit because you've got a lot of severance pay coming. You've been here a long time* * * * [.] They're [Landmark] working on a severance pay [*sic*] for the whole State of Ohio because they're getting rid of a lot of people. *Whatever you do, don't quit.*" (Emphasis added.)

Schumacher and Hiegle made further statements of assurance which merely reinforced appellants' quite reasonable belief that Landmark would furnish them with substantial severance pay, given their many years of service, if only they refrained from leaving their employment until the company actually closed. The fact that appellants eventually received copies of the severance provisions then in force only enhanced the promissory quality of the oral assurances.

As defined in 1 Restatement of Contracts, *supra*, at 8, Section 2:

"(1) A promise is a manifestation of intention to act or refrain from acting in a specified way, *so made as to justify a promisee in understanding that a commitment has been made.*" (Emphasis added.)

On these facts, we conclude that the series of oral assurances of severance pay that Landmark's agents made to appellants, when coupled with *Sigman* v. *Wurlitzer Co.* (1937), 57 Ohio App. 4; the written severance provisions they later saw, constituted promissory representations or offers[9] which justified them in believing that "a commitment [had] been made." A plethora of jurisdictions have reached the same conclusion on similar facts. See, *e.g.*, *Dulany Foods, Inc.* v. *Ayers* (1979), 220 Va. 502, 260 S.E. 2d 196; *Dangott* v. *ASG Indus., Inc.* (Okla. 1976), 558 P. 2d 379; *Gaydos* v. *White Motor Corp.* (1974), 54 Mich. App. 143, 220 N.W. 2d 697; see, also, *Day* v. *Good Samaritan Hospital and Health Ctr., supra*; *Her-*

---

[7] The gist of Rupp's statements about Landmark's take-over of LCLM was clearly that "everything would remain the same" and that "nothing would be changed" with respect to the employees' benefits. While this does not concern the disputed issue of severance pay, it does imply that Landmark intended to continue its employment contract with appellants on the same terms and conditions as prevailed under LCLM. When Landmark later unilaterally reduced Jacobs' and Phillips' paid vacation from four weeks to three weeks, it thereby breached the terms of the original offer (as manifested in Rupp's assurances), which Jacobs and Phillips had accepted by continuing in the employment of the new company. However, since the principal dispute is over severance pay, the thrust of our analysis in the text concerns only the representations relating to that issue.

[8] Obviously, for purposes of the present analysis, if appellants had never learned of Landmark's severance policy, they could hardly be heard to complain about being denied benefits they were never offered. See *Alfaro* v. *Stauffer Chem. Co.* (1977), 173 Ind. App. 89, 362 N.E. 2d 500. But the plain fact is that the severance policy was explicitly communicated to them as an inducement to remain on the job until Landmark closed the Curtice facility.

[9] See 1 Restatement of the Law 2d, Contracts (1981) 72, Section 24, Comment *a*, wherein an offer may be construed as a promise:

"*Offer as promise.* An offer * * * may propose the exchange of a promise for a performance or an exchange of promises[.] * * * [*I*]*n the case of an offer or a promise for an act, the offer itself is a promise, revocable until accepted.*" (Emphasis added.)

See, also, *id.*, at 84, Section 30 ("Form of Acceptance Invited").

*cules Powder Co.* v. *Brookfield* (1949), 189 Va. 531, 53 S.E. 2d 804; cf. *Martin* v. *Mann Merchandising* (Tex. Civ. App. 1978), 570 S.W. 2d 208; cf., also, *Chinn* v. *China National Aviation Corp.* (1955), 138 Cal. App. 2d 98, 291 P. 2d 91.

B

Landmark vigorously emphasizes the fact that its manual contained two "disclaimer" provisions — one providing for *discretionary* payment of severance benefits and the other stating that the company could unilaterally amend the provisions without incurring liability. Such disclaimers are legitimately within the realm of the employer's bargaining power and are not necessarily antagonistic to concepts of good faith and fair dealing when adhered to consistently and unambiguously. As the *Toussaint* court observed:

"An employer who establishes no personnel policies instills no reasonable expectations of performance. Employers can make known to their employees that personnel policies are subject to unilateral changes by the employer. Employees would then have no legitimate expectation that any particular policy will continue to remain in force. Employees could, however, legitimately expect that policies in force at any given time will be uniformly applied to all." *Toussaint* v. *Blue Cross & Blue Shield of Michigan, supra,* at 619, 292 N.W. 2d at 894-895.

However, to the extent that the oral assurances of severance pay conflicted with the manual's disclaimers, or in-duced appellants to disregard their significance, we hold that such representations will negate the effect of disclaimers which are intended to absolve the employer from liability for unilateral alterations of or deviations from policies presented in the written manual or similar employer writings. See DeGiuseppe, The Effect of the Employment-At-Will Rule on Employee Rights to Job Security and Fringe Benefits (1981), 10 Fordham Urban L.J. 1, 48-54. The trial court erred in focusing exclusively on the manual's written provisions, since other evidence demonstrates that a definite verbal offer was made. Here, the verbal assurances about what the severance provisions would mean sufficed to negate any purported disclaimer, such as that severance benefits turned upon the fortuities of unilateral amendment. Accordingly, Landmark made a viable offer of severance pay; it was neither in form illusory nor in substance gratuitous. See, e.g., *Dulany Foods, Inc.* v. *Ayers, supra.*

III

Having found that an offer of severance benefits was made, we now address whether that offer was accepted by appellants and, if so, whether consideration was furnished to render it enforceable.

Here, Landmark's offer of severance pay precipitated the formation of a unilateral contract, and acceptance was effective when appellants remained with Landmark after learning of the new severance policy.[10] See 1 Restate-

---

[10] Landmark does not seriously challenge appellants' *knowledge* of the severance policy, but maintains only that they never actually *saw* the manual itself (or the severance provisions therein) until the first few months of 1982. If there is some distinction here, it is one without a difference. Insofar as notice or knowledge of the new/changed terms of the employment contract may be an issue in a case (and it is not an issue here), we agree with the following statement:

"Notice of a company's benefit policy may be disseminated to its employees in a number of ways. Employees need not have examined the actual policy in a personnel manual or some other employee handbook prior to or during their employment with an employer in order for there to be an offer

ment of Contracts, *supra,* at 128, Section 50, Comment *b.* Whether they actually considered other opportunities for employment is irrelevant. For purposes of consideration, the employee's retention of his position and continued performance of his work suffice to render the new condition of severance pay enforceable. Stated differently, a single performance may often furnish consideration for multiple promises. See 1 Restatement of Contracts, *supra,* at 204, Section 80, Comment *a.* This is currently the prevailing rule in jurisdictions that have addressed the issue. See *Pine River State Bank* v. *Mettille, supra,* at 629 ("Handbook provisions relating to such matters as bonuses, severance pay and commission rates are enforceable without the need for additional, new consideration beyond the services to be performed."); *Dulany Foods, Inc.* v. *Ayers, supra,* at 508-509, 260 S.E. 2d at 201-202; *Gaydos* v. *White Motor Corp., supra,* at 148, 220 N.W. 2d at 700; *Chinn* v. *China National Aviation Corp., supra,* at 100-101, 291 P. 2d at 94; see, also, DeGiuseppe, *supra,* at 52, 57 ("The [employee's] continued employment constitutes sufficient consideration for the offer [of severance pay]." See, also, the numerous cases cited, *id.,* at 57, fn. 303; cf. *Leone* v. *Precision Plumbing & Heating of So. Ariz., Inc.*

(App. 1979), 121 Ariz. 514, 591 P. 2d 1002.

In this case, therefore, appellants accepted Landmark's offer of severance pay by rendering their performance (*i.e.,* by retaining their employment with Landmark), and sufficient consideration was furnished to support Landmark's offer when appellants continued working after they learned of the offered severance pay.[11] See 1A Corbin, Contracts (1963), Section 153; cf. *Parish & Bingham Corp.* v. *Jackson* (1921), 16 Ohio App. 51, 55-56. Consequently, Landmark incurred a binding contractual obligation to provide appellants with severance pay consistent with the terms of the manual then in force in December 1981. Landmark breached this obligation in August 1982 when it failed to pay appellants those benefits.

### IV

In the case *sub judice,* the trial court found that lack of mutuality of obligation, and the related doctrine of illusory promise, precluded the creation of an enforceable contract. Landmark's remaining arguments essentially reiterate the trial court's position on these issues. Having already dispensed with the "illusory promise" contention regarding Landmark's offer of severance pay, we

---

capable of acceptance. Aside from actually reading the policy, employees also may learn of a benefit policy from company notices, from talking to other employees, or from prior occasions where the benefits in question had been given to eligible employees under similar circumstances." (Footnotes omitted.) DeGiuseppe, The Effect of the Employment-At-Will Rule on Employee Rights to Job Security and Fringe Benefits (1981), 10 Fordham Urban L.J. 1, 51-52.

Suffice it to say that appellants knew about the severance policy and, upon being assured by Rupp, Schumacher and Hiegle that they stood to reap substantial monetary benefits for their numerous years of service,

they stayed with Curtice Landmark expecting to receive the same.

[11] Although from the circumstances the point is more or less intuitively obvious, appellants were not required, formally or explicitly, to notify Landmark that they had accepted its offer of severance benefits. See 1 Restatement of Contracts, *supra,* at 136, Section 54 ["Acceptance by Performance"], which states:

"(1) Where an offer invites an offeree to accept by rendering a performance, no notification is necessary to make such an acceptance effective unless the offer requests such a notification."

now turn to the lack of mutuality argument.

Stripped to its essence, the concept of "mutuality of obligation" expresses the idea that "both parties to the contract must be bound or neither is bound." However, this formulation applies only to an analysis of *bilateral* contracts, in which reciprocal promises are exchanged. See 1A Corbin, *supra,* at 2-6, Section 152. *Unilateral* contracts, almost by definition, are not amenable to the "mutuality" doctrine. See 1 Restatement of Contracts, *supra,* at 203, Section 79, Comment *f;* see 1A Corbin, *supra.*

"The modern decisional tendency is against lending the aid of courts to defeat contracts on technical grounds of want of mutuality." *Texas Gas Utilities Co.* v. *Barrett* (Tex. 1970), 460 S.W. 2d 409, 412. As a contract defense, the mutuality doctrine has become a faltering rampart to which a litigant retreats at his own peril. Under contemporary analysis of unilateral contracts, the "mutuality" doctrine crumbles of its own weight. See 1A Corbin, *supra,* at 13-17, Section 152, and at 18-20, Section 153; see, also, Calamari & Perillo, Contracts (1977) 156-158, Sections 4-14 and 4-15.

Hence, recent authority portends a decisive shift to a more radical (*i.e.,* more fundamental) approach. This approach treats the "mutuality of obligation" doctrine as requiring only a *quid pro quo.* Thus understood, a unilateral contract lacks "mutuality" only when there is a *failure of consideration.* See 1 Restatement of Contracts, *supra,* at 200, Section 79 ("If the requirement of consideration is met, there is no additional requirement of * * * 'mutuality of obligation.' "); see *Toussaint* v. *Blue Cross & Blue Shield of Michigan, supra,* at 600, 292 N.W. 2d at 885 ("The enforceability of a contract depends * * * on consideration and not mutuality of obligation. The proper inquiry is whether the employee has given consideration for the employer's promise of * * * [benefit]."); *Pine River State Bank* v. *Mettille, supra,* at 629 ("[T]he concept of mutuality [of obligation] in contract law has been widely discredited."); *Weiner* v. *McGraw-Hill, Inc., supra,* at 444; see, also, *Langdon* v. *SAGA Corp.* (Okla. App. 1977), 569 P. 2d 524, 527.

In the case of a unilateral contract, as here, the promisor's offer is accepted by the promisee's performance rather than by a return promise to perform. Consequently, when the promisee's performance is executed, enforceable obligations arise without more. Under this analysis, then, appellants' continued employment, as the bargained-for-consideration, rendered the contract to pay severance benefits enforceable, regardless of "mutuality" or a lack thereof. The trial court erred in concluding otherwise. Accordingly, since the facts establish a binding unilateral contract, appellants' first, second and fourth assignments of error are well-taken.

## V

## A

Appellants' fifth assignment of error is as follows:

"The court below erred in finding that no notice need be given to employees of changes in their established benefits and employment contract."

Having found that an enforceable unilateral contract existed, we further find that appellants' fifth assignment of error has merit. As soon as appellants performed their jobs even one day after learning of the offered severance pay, Landmark could not alter, amend or otherwise revoke the terms thereof, then in effect in December 1981, unless it first effected a valid modification (or, as the parties have referred to it, a "novation"). See 1A Corbin, *supra,* at 19-20, Section 153 ("[T]he employer's

offered promise becomes irrevocable by him as soon as the employee has rendered any substantial service in the process of accepting; and this is true in spite of the fact that the employee may be privileged to quit the service at any time."). As Landmark concedes, if a unilateral contract for severance pay existed, then any contemplated modification would require legally adequate notice to the employees of the proposed change, in addition to the other elements of contract modification. No such notice, and therefore no valid modification, occurred here.

While Landmark certainly remained free to modify its severance policy *prospectively*, and without prejudice to the accrued years of service of those employees (such as appellants) who accepted the terms of the December 1981 severance policy, the company was not free to disregard its contractual obligations merely because it was economically advantageous to do so. See *Langdon* v. *SAGA Corp.*, *supra*, at 527-528. Therefore, Landmark is liable to appellants for accrued severance pay based upon the manual's terms for calculating "completed years of service" that were in force in December 1981. Accordingly, appellants' fifth assignment of error is well-taken.

## B

Appellants' third assignment of error is as follows:

"The court below erred in finding that plaintiffs did not rely to their detriment on defendant's promise of benefits."

In support of this assignment of error, appellants argue their alternative theory of promissory estoppel. See *Blackwell* v. *Internatl. Union, U.A.W.* (1983), 9 Ohio App. 3d 179. Yet, having held that appellants have an enforceable contract right to their severance pay, we find that their third assignment of error is now rendered moot and, for that reason, it is not well-taken.

On consideration whereof, the judgment of the Lucas County Court of Common Pleas is hereby reversed. Pursuant to App. R. 12(B), there being no disputed issues of material fact, we now render the judgment which the trial court should have rendered as a matter of law under Civ. R. 56(C), to wit: Landmark's motion to dismiss is hereby denied. Appellants' motion for summary judgment is hereby granted. Judgment is hereby entered against Landmark in favor of appellants in an amount to be determined on remand.[12]

This case is remanded to said court for computation of damages (severance pay), as herein specified, and for assessment of costs against Landmark upon final determination of said damages.

*Judgment reversed.*

DOUGLAS, J., concurs.

WILEY, J., concurs in judgment only.

---

[12] The record herein unequivocally indicates the number of years that each appellant worked for Landmark: Phillips was employed for twenty-eight years; Jacobs for nineteen years; and Helle for fourteen years. Therefore, based upon the manual's severance pay table (as quoted in the text), each appellant is entitled to the following number of weeks of severance pay: Phillips is entitled to forty-one weeks; Jacobs to twenty-three weeks; and Helle to eleven weeks. Not clear from the record, however, is the specific "dollar-amount" by which the foregoing weeks of severance pay are to be calculated in determining the ultimate "lump sum" figure owed appellants. Thus, the remand here is limited to the calculation of the precise amount of severance pay each appellant is to receive, given the foregoing (weekly) totals to which they are respectively entitled.

**14**

WILEY, J., retired, of the Sixth Appellate District, was assigned to active duty pursuant to Section 6(C), Article IV, Constitution.

DOUGLAS, J., concurring. I write separately only to make the point that in addition to the clear contract question, I believe, further, that the employee-at-will doctrine is an issue in this case. This archaic and rapidly disappearing doctrine (applied as an absolute) needs further example of why that is so. The doctrine has long been used to terminate employees (who are without protection pursuant to a firm contract of employment and/or union protection through a collective bargaining agreement) summarily, notwithstanding reliance by an employee upon assurances of employment, either verbally or through employment manuals rising to the level of contract. Obviously, when just cause exists, the employee's employment can be summarily terminated. Likewise, if an employee is told upon employment that his or her services can be terminated with or without reason, notice or cause, then at least such employee knows that he or she can be "here today and gone tomorrow." When such is not delineated at the onset of the employment relationship, then it would appear that other matters, including the doctrine of fundamental fairness, should be considered.

In the case now before us, I find that the reliance of appellants on the assertions (promises) of appellee established a contract of employment. In addition, I find that the promulgation by appellee of its employment policy manual and appellants' reliance thereon also established a contract of employment and thus appellants were no longer "employees at will." Not being employees at will, appellants could not be dispatched to the ranks of the unemployed without appellee keeping the agreement made with them, to wit: to pay severance pay pursuant to the promises made by appellee and pursuant to the terms of the employment manual before it was unilaterally changed by appellee, all of which were accepted by appellants by virtue of their continuing to work for appellee past the date of the promises made to them. Thus, in addition to finding the other assignments of error well-taken, I would also find assignment of error three well-taken, rather than moot.