In re SUN TAN ACRES, INC., Debtor.

SUN TAN ACRES, INC., Plaintiff,

v.

MIDLAND BUCKEYE FEDERAL SAVINGS & LOAN ASSOCIATION and Midland Service Corporation, Defendants.

Bankruptcy No. B87–00921–Y.
Adv. No. 88–0022.

United States Bankruptcy Court,
N.D. Ohio.

March 7, 1989.

Thomas J. Tangi, Alliance, Ohio, Gary A. Banas, Canton, Ohio, for plaintiff/debtor.

Richard C. Ross, Richard C. Ross Co., L.P.A., Sebring, Ohio, for defendants.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This cause came before the Court on the Debtor's Amended Complaint against MID-LAND BUCKEYE FEDERAL SAVINGS & LOAN ASSOCIATION ("MIDLAND BUCKEYE") and MIDLAND SERVICE CORPORATION ("MIDLAND SERVICE") for breach of contract. This is a core proceeding pursuant 28 U.S.C. Sec. 157(b)(2).

## FACTS

On December 24, 1984, the Debtor borrowed Three Hundred Eighty–Five Thousand & 00/100 Dollars ($385,000.00) from MIDLAND BUCKEYE to purchase four (4) parcels of land in or near Alliance, Ohio. The Debtor executed a mortgage deed on the purchased property to MIDLAND BUCKEYE to secure the indebtedness. The Debtor established a recreational area known as "Suntan Park", which included a swimming pool, par 3 golf course and a pro shop.

Due to the seasonal nature of the business, the Debtor experienced recurring problems in meeting the required payments to MIDLAND BUCKEYE during the winter months. It appears that normally winter repayment problems were resolved by cooperation between the Debtor and MID-LAND BUCKEYE.

On September 29, 1986, Suntan Park was listed for sale with a local real estate office. Apparently, the Debtor defaulted on its loan repayments at about that time.[1] On February 11, 1987, two of the Debtor's officers met with representatives of MID-

---

1. Although testimony during trial suggested that the Debtor defaulted in December, 1986, the Debtor admitted in its Post–Trial Brief that Debtor first defaulted in October, 1986.

LAND BUCKEYE and MIDLAND SERVICE regarding the arrearage.[2] At the meeting, ROBERT H. STONE, ESQ., President of the Debtor, stated that the Debtor was unable to bring the loan current. ROBERT STICKER, President of both MIDLAND BUCKEYE and MIDLAND SERVICE, apparently suggested the development of a trailer or mobile home park in order to solve the cash flow problem which occurred during the winter months. Mr. Stone questioned how the Debtor could pay for engineering plans for campgrounds when it could not pay the arrearage on the loan. Mr. Sticker indicated that if the Debtor brought the loan current, then MIDLAND BUCKEYE would seek agreement by its Directors to a three-month moratorium on further installment payments. Mr. Stone testified that Mr. Sticker also agreed to have MIDLAND SERVICE draw up engineering plans for campgrounds within the park, which costs would be paid out of the proceeds of a subsequent sale of the park. This is disputed by MIDLAND BUCKEYE. Mr. Stone accepted the terms of the agreement as he understood it.

In order to raise sufficient funds to bring the loan current, Mr. Stone convened a special shareholder meeting for the Debtor and sent a letter out to all shareholders. In both the meeting and the letter, Mr. Stone apparently attempted to convince present shareholders to purchase additional shares of stock in the company.[3] Mr. Stone's efforts were largely unsuccessful.[4] As a result, Mr. Stone personally secured a signature loan and used those and other personal funds to bring Debtor's loan current.[5] On March 23, 1987, Mr. Stone delivered two (2) financial statements, two (2) plat maps, and a copy of the Ohio State Campground Regulations to the office of Mr. Shreve, former Vice–President of

Lending at MIDLAND BUCKEYE. On March 24, 1987, MIDLAND BUCKEYE's Board of Directors approved a three-month moratorium on the Debtor's installment obligation. Although it appears that Mr. Stone repeatedly called MIDLAND BUCKEYE to inquire about the development of campground plans, his calls were not returned. At about this same time, DANIEL SCHLABACH notified Mr. Stone that he would be willing to purchase the park for Six Hundred Fifty Thousand & 00/100 Dollars ($650,000.00) after the engineering plans had been completed. In early June, 1987, Mr. Stone confronted Mr. Shreve and discovered that no plans were being prepared. In fact, MIDLAND SERVICE never had the ability to draw up engineering plans because the sole employee of MIDLAND SERVICE was a surveyor, whereas the preparation and filing of campground plans requires the certification of a professional engineer. On July 24, 1987, the Debtor filed its petition for relief under Chapter 11 of Title 11, United States Code. The Amended Complaint in this adversary action was filed on May 6, 1988, and a hearing was held on January 10, 1989.

## DISCUSSION

The initial issue which we must consider is whether there was an understanding reached between the Debtor and MIDLAND BUCKEYE on February 11, 1987. When the Debtor's officers attended the meeting on that day, it appears that they were ready to acquiesce in foreclosure because the Debtor had insufficient funds to implement any other viable alternative. Under these circumstances, it does not appear that Mr. Stone would be willing to commit further personal funds to cure the arrearage on the loan in exchange for a

2. Robert H. Stone, Esq., and Mr. Charles Alexander represented the Debtor. Mr. Richard Shreve and Thomas P. Moushey, Esq., represented MIDLAND BUCKEYE, while Robert E. Stricker appeared on behalf of MIDLAND BUCKEYE and MIDLAND SERVICE.

3. Apparently, there were 17 authorized but unissued shares in the Company.

4. One shareholder responded to the letter and purchased one additional share for Five Hundred & 00/100 Dollars ($500.00).

5. It appears that the loan was brought current in two installments—Twelve Thousand, Five Hundred & 00/100 Dollars ($12,500.00) on February 28, 1987, and Two Thousand, Five Hundred Seventy–Five & 21/100 Dollars ($2,575.21) on March 24, 1987.

three-month moratorium alone. The testimony of Mr. Stone, Mr. Alexander, and Mr. Moushey suggests that Mr. Sticker offered to provide engineering services to the Debtor if it so desired. Mr. Moushey testified that:

Bob Sticker suggested Midland Service had a surveyor and engineer by the name of Ron Hinton who worked for them who could perform that type of work [planning roads and utilities] if that's what they [the Debtor] wanted to do.

Based on the testimony as a whole, the Court is persuaded that MIDLAND BUCKEYE, through its agent Robert Sticker, offered to (1) seek a three-month moratorium on payments to the Debtor; and (2) provide the Debtor with engineering services for the development of a trailer park. In exchange, the Debtor would be required to bring the loan payments current as of February, 1987. However, it also appears that the meeting concluded without a formal acceptance of this offer.

▆ The Debtor contends that the effect of the transaction taken as a whole is that a novation occurred on February 11, 1987. There are two requirements to effect a novation under Ohio law:

(1) discharge of a valid, existing obligation by mutual agreement of all parties; and

(2) substitution of a new debt, debtor or creditor in a new obligation.

*See Federal Land Bank v. Taggart,* 31 Ohio St.3d 8, 508 N.E.2d 152 (1987); *Citizens State Bank v. Richart,* 16 Ohio App. 3d 445, 476 N.E.2d 383 (1984). The Debtor correctly admits that the burden of proving a novation is on the party who asserts it as a claim. The Court is convinced that the Debtor has failed to sustain its burden on the first element. There is nothing in the record to suggest that representatives of either the Debtor or MIDLAND BUCKEYE viewed the original obligation to be extinguished. Indeed, Mr. Stone testified that MIDLAND BUCKEYE never agreed to cancel its note and mortgage. Therefore, as a matter of law, the Debtor is not entitled to recover on the theory of novation.

▆ Next, the Debtor argues that the contract was modified on February 11, 1987, when the Debtor was granted a three-month extension or moratorium on its loan. The original note provides, in part:

From time to time, without affecting the obligation of the undersigned or the successors or assigns of the undersigned to pay the outstanding principal balance of this Note and observe the covenants of the undersigned contained herein ..., and without liability on the part of the holder hereof, the holder hereof may, at the option of the holder, hereof, extend the time for payment of said outstanding principal balance or any part thereof....

Thus, according to the note, MIDLAND BUCKEYE had the authority to extend the repayment period by granting the moratorium without effecting any modification of the contractual obligations and rights under the note. Thus, the Debtor is not entitled to judgment on the theory of a contractual modification.

▆ The Debtor also alleges that MIDLAND BUCKEYE fraudulently misled officers of the Debtor in promising the preparation of engineering plans. The Debtor correctly states the elements of an action for fraud:

(1) actual concealment of a material fact;

(2) defendant had knowledge of the fact;

(3) intent to mislead another;

(4) actual and reasonable reliance by plaintiff; and

(5) injury resulting from that reliance.

After a considered evaluation of the testimony and exhibits in this case, the Court has concluded that the Debtor failed to prove that Mr. Sticker knowingly intended to mislead the Debtor's officers when he stated that Mr. Hinton of MIDLAND SERVICE could perform engineering work. Although there is evidence to suggest that MIDLAND BUCKEYE, through its officers, did not conduct itself in a wholly professional and responsible manner, we are not persuaded that the evidence is sufficient to warrant a finding of fraud.

▆ Finally, the Debtor contends that it is entitled to relief under the principles of

promissory estoppel. A claim under the theory of promissory estoppel requires a party to prove that:

(1) a promise was made;

(2) the promissor should have reasonably expected to induce reliance on the part of the promisee;

(3) the promisee actually relied on the promise;

(4) enforcement of the promise is necessary to avoid injustice.

*Bruchac v. Universal Cab Co.*, 580 F.Supp. 295, 303 (N.D.Ohio 1984). The offer by MIDLAND BUCKEYE to provide engineering services was in the *nature* of a unilateral contract which was explained in *Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 472 N.E.2d 765 (1984):

In the case of a unilateral contract, as here, the promissor's offer is accepted by the promisee's performance rather than by a return promise to perform. Consequently, when the promisee's performance is executed, enforceable obligations arise without more.[6]

*Id.* at 12, 472 N.E.2d 765. In this case, Mr. Sticker promised to have MIDLAND SERVICE provide engineering drawings once the loan was brought current and the Debtor indicated a desire for such plans. Thus, we find the existence of a sufficient promise by MIDLAND BUCKEYE to fulfill the first element.

The second element requires that a promissor reasonably expect to induce a promisee's action or forebearance in reliance upon the promise of representation. In *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), the Ohio Supreme Court held that the controlling consideration was what a promissor should reasonably expect a promisee to believe the promise means.[7] When Mr. Stone left the meeting on February 11, 1987, it appears that he told Mr. Sticker and/or Mr. Shreve

of his intent to raise enough money to bring the Debtor's loan current. Mr. Sticker and Mr. Shreve should have realized that the only motivation behind such a move was to accept MIDLAND BUCKEYE's offer to prepare engineering plans to permit the sale or restructuring of Debtor. Mr. Alexander's testimony, taken with the testimony of others, supports the conclusion that it was not unreasonable for Mr. Sticker and Mr. Shreve to expect Mr. Stone, as President of the Debtor, to act in reliance on Mr. Sticker's promise.

The third element requires that the promisee actually rely on the promise. The Debtor borrowed over Fifteen Thousand & 00/100 Dollars ($15,000.00) to bring the loan current. Mr. Stone's letter to Mr. Shreve, along with plat maps and other material, demonstrates the continued reliance on MIDLAND BUCKEYE's promise.

The final element requires that equity demand enforcement of the promise. The Court finds that the Debtor relied to its detriment on MIDLAND BUCKEYE's promise. As a result, we conclude that the Debtor is entitled to judgment against MIDLAND BUCKEYE on a theory of promissory estoppel.

The last question we must consider is the amount of damages to which the Debtor may be entitled. The Debtor's most substantial claim is for Six Hundred Fifty Thousand & 00/100 Dollars ($650,000.00) as compensation for the loss of the sale to Mr. Schlabach. There was no showing that the Debtor could have obtained drawings elsewhere, as Debtor's President admitted it lacked resources to do so and, thus, relied on Mr. Sticker's suggestions. In fact, the testimony showed that the Debtor's officers were ready to acquiesce in foreclosure of the property before the February 11, 1987 meeting. Furthermore, Mr. Schlabach testified that he decided not to buy

---

**6.** The Court recognizes that recovery on a theory of promissory estoppel is "off the contract," but the result of a unilateral contract is instructive here in determining whether a promise was ever made.

**7.** The *Mers* court relied upon Sec. 90 of *The Restatement (Second) of Contracts,* which speaks

in terms of the promissor's reasonable expectations. Although the rule of law adopted by the *Mers* court does not include a specific requirement of reasonableness on the part of the promisee, the Court believes that such a requirement is inherent therein.

the park because he had heard that the Debtor was in financial distress and he believed that his waiting until Debtor was in default might produce a better bargain. The absence of engineering drawings does not appear to have been the primary reason for the withdrawal of his purchase offer. Finally, as a matter of law, the Debtor cannot recover damages for either lost profits or lost opportunities on a promissory estoppel claim. *Cincinnati Fluid Power, Inc. v. Rexnord, Inc.*, 773 F.2d 92 (6th Cir.1985); *R. Renaissance, Inc., v. Rohm & Haas Co.*, 674 F.Supp. 591 (S.D.Ohio 1987); *McIntosh v. Micheli Restaurant, Inc.*, 22 Ohio Misc.2d 5, 488 N.E.2d 1261 (1984). The Court also does not believe that punitive damages are appropriate given the factual circumstances found in this case. The Debtor has sustained damage in the amount of indebtedness incurred to bring the loan current—Fifteen Thousand, Seventy–Five & 21/100 Dollars ($15,-075.21). Judgment shall be entered for the Debtor in that amount.

This Memorandum Opinion constitutes the findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

An appropriate Order shall enter.