9 F.3d 107
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
David J. FRANCIS, Plaintiff-Appellant,
v.
GAYLORD CONTAINER CORPORATION, Defendant-Appellee.
 No. 92-4287.
 United States Court of Appeals, Sixth Circuit.
 Oct. 22, 1993.
 
 Before: KEITH, NELSON, and RYAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from a summary judgment for the defendant employer in a wrongful discharge case. Concluding, on de novo review, that the plaintiff has not demonstrated the existence of any genuine issue of material fact and that the defendant is entitled to judgment as a matter of law, we shall affirm the judgment.
 
 
 2
 * The plaintiff, David J. Francis, is a British subject who resides in the United States. In the latter part of 1987 Mr. Francis was hired by the defendant, Gaylord Container Corporation, as general manager of the company's corrugated cardboard manufacturing plant in Baltimore, Ohio. The plant lost money during Mr. Francis' tenure, and Gaylord discharged him on October 12, 1989. Several months later the plant was permanently closed.
 
 
 3
 Prior to his first contact with Gaylord in 1987, Mr. Francis had received an offer of employment in Saudi Arabia from a company called Banawi Enterprises. Mr. Francis wanted to secure permanent resident status in the United States, and in order to do so he needed a job in this country. The Saudi job would have entailed a two-year overseas commitment, but Mr. Francis believed that if he took that job there was a good chance that Banawi would transfer him to the United States after two years.
 
 
 4
 The Banawi offer was still pending when James Chavoen, a regional manager at Gaylord, contacted Mr. Francis to explore the possibility of his going to work for Gaylord in the United States. It is undisputed that the prospect of immediate employment in this country appealed to Mr. Francis as a means of obtaining a permanent resident's "green card" sooner than might otherwise have been possible. Representatives of Gaylord assured Mr. Francis that the company would assist him in obtaining a green card, and would hire an attorney to facilitate the process, were an offer of the plant managership to be extended and accepted.
 
 
 5
 Gaylord delayed in deciding on whether to extend a job offer, and Mr. Francis accepted Banawi's offer. On the morning of the day he was scheduled to leave for Saudi Arabia, however, Mr. Francis was offered the Baltimore job at a salary of $85,000 per year. He rejected the offer. Mr. Chavoen then called back and offered $90,000. This time Mr. Francis accepted. The offer and acceptance were confirmed soon thereafter by a letter from D'Arcy Didier, Gaylord's Director of Human Resources.
 
 
 6
 Prior to making the offer, Mr. Francis says, Chavoen indicated that the job would be "long term" and would carry "job security." Francis admits, however, that no specific term of employment was mentioned. He further admits that nobody at Gaylord told him in so many words that he could only be discharged for good cause.
 
 
 7
 After his arrival at Gaylord, Mr. Francis says, Mr. Chavoen made the observation that "it was nice to have a general manager around here who couldn't leave." D'Arcy Didier is claimed to have said "I hope Dave works out because we're going to have a hell of a time getting rid of [him] if he doesn't," and (speaking to Francis) "You're the only one around here we can't fire."
 
 
 8
 It is clear that Gaylord could and did fire a number of other executives, including Mr. Chavoen himself. Chavoen's immediate successor was likewise fired. That individual was replaced, in turn, by a man named Duane Matschullat. Mr. Matschullat does not appear to have warmed to Mr. Francis, and it was Matschullat by whom Francis was ultimately fired.
 
 
 9
 Prior to the discharge Matschullat is claimed to have made several slighting references to Francis' British national origin. Mr. Francis testified that Matschullat said, on separate occasions, "isn't it great that the sun ha[s] finally shone [sic] on the British Empire[,] and we [don't] have to put up with all their bullshit anymore," and "ever since you bloody Brits have lost the empire, you don't know what to do with yourselves, but I'm not going to put up with this kind of presentation anymore." On "two, possibly three" occasions, according to Mr. Francis, Matschullat referred to him as "the Brit," as when he said that "the Brit can't even organize an ashtray."
 
 
 10
 Mr. Francis was fired on October 12, 1989. Gaylord maintains that the termination was based on unsatisfactory performance.
 
 
 11
 Mr. Francis brought suit against Gaylord in the Court of Common Pleas of Fairfield County, Ohio, in May of 1990. The complaint alleged, among other things, that Gaylord had discriminated against him on the basis of his national origin, in contravention of Ohio Rev.Code Sec. 4112.02; that the termination constituted a breach of a contract of employment; that the doctrine of promissory estoppel precluded Gaylord from firing him; and that Gaylord had violated a contractual undertaking to get Mr. Francis a green card. Gaylord removed the case to the United States District Court for the Southern District of Ohio on the basis of diversity of citizenship and the amount in controversy. In due course Gaylord moved for summary judgment on all of Mr. Francis' claims. The district court granted the motion, and this appeal followed.
 
 II
 
 12
 Under Ohio law, an employment relationship that has no fixed duration is presumed to be terminable at will. Employment agreements that "purpor[t] to be permanent or for life, or for no fixed time period [are] considered to be terminable at the will of either party." Humphreys v. Bellaire Corp., 966 F.2d 1037, 1040 (6th Cir.1992) (quoting Henkel v. Education Research Council, 45 Ohio St.2d 249, 344 N.E.2d 118 (1976)). Presumptively, at least, Mr. Francis was employed by Gaylord on an at-will basis.
 
 
 13
 Courts may consider the facts and circumstances surrounding a presumptively at-will agreement to determine whether the parties expressly or impliedly agreed to limit the circumstances under which a discharge would be permissible. See Mers v. Dispatch Printing Co., 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), where the second paragraph of the court's syllabus reads as follows:
 
 
 14
 "The facts and circumstances surrounding an oral employment-at-will agreement, including the character of the employment, custom, the course of dealing between the parties, company policy or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the agreement's explicit and implicit terms concerning discharge."
 
 
 15
 Mr. Francis has pointed to no facts or circumstances indicative of explicit or implicit limits on the grounds for which he could be discharged. No one ever told Mr. Francis that he could only be fired for cause. No company manual promised that employment would be other than at-will. Mr. Chavoen's references to "job security" and "long term opportunity" were clearly insufficient to take the employment relationship out of the "at-will" category.
 
 
 16
 Neither did any of the several statements made after Mr. Francis started work amount to a promise that he would not be fired except for cause. If any such post-hiring promise had been made, moreover, it would have been unenforceable for want of consideration. See Henkel, 344 N.E.2d at 121-122 ("a contract for permanent employment ... where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party); Mers, 483 N.E.2d at 153 n. 1.
 
 
 17
 Mr. Francis cites Helle v. Landmark Inc., 15 Ohio App.3d 1, 472 N.E.2d 765 (Lucas 1984), for the proposition that merely continuing to work for an employer may suffice as consideration. Helle, however, involved a fresh promise of severance benefits to employees whose place of employment was scheduled to be closed. The promise was made for the specific purpose of persuading employees not to pursue other opportunities prior to the scheduled closing date. Id. at 775-76. No post-hiring promises were made to Mr. Francis in order to persuade him not to pursue other opportunities, and Helle cannot afford Mr. Francis much comfort under the facts and circumstances presented here.
 
 
 18
 Helmick v. Cincinnati Word Processing, Inc., 45 Ohio St.3d 131, 543 N.E.2d 1212 (1989), does not help Mr. Francis either. The plaintiff in Helmick established the existence of a mutual understanding that she would not be fired except for cause. Her at-will employment relationship was transformed into a just-cause contract when she was specifically promised that her employment would not be terminated as long as her performance was satisfactory. This promise was made to dissuade her from continuing to seek other employment, and it had the desired effect; she refrained from further job hunting. Mr. Francis has offered no evidence comparable to that presented in Helmick.[1]
 
 
 19
 Mr. Francis has not shown a meeting of the minds on anything other than a contract of employment at will. See Kiel v. Circuit Design Technology, Inc., 55 Ohio App.3d 63, 562 N.E.2d 517, 520 (Cuyahoga 1989) (mutual agreement essential for creation of a just-cause employment contract). In light of Ohio's "strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other," Henkel, 344 N.E.2d at 122, Mr. Francis was not entitled to a jury trial on his claim for breach of an employment contract.
 
 III
 
 20
 Under Mers, 483 N.E.2d at 154 (1985), the doctrine of promissory estoppel may limit an employer's freedom to terminate an employment relationship without cause. To establish a promissory estoppel claim in an employment context, an employee must demonstrate (1) that his employer made a "promise which the [employer] should reasonably [have expected] to induce action or forbearance on the part of the promisee ... and which [did] induce such action or forbearance," and (2) that "injustice can only be avoided by enforcement of the promise." Id. (quoting Talley v. Teamsters Local No. 377, 48 Ohio St.2d 142, 146, 357 N.E.2d 44 (1976)).
 
 
 21
 As evidence of detrimental reliance, Mr. Francis points to the fact that he turned down a job in Saudi Arabia in order to accept employment at Gaylord. But this would only be relevant if the promise on which Mr. Francis claims to have relied had been made prior to his rejection of the Saudi job. See Bernard v. Rockwell International Corp., 869 F.2d 928, 933 (6th Cir.1989); Karnes v. Doctor's Hospital, 51 Ohio St.3d 139, 555 N.E.2d 280, 283 (1990). Except for the green card matter, to which we shall turn shortly, Mr. Francis has not identified any firm promise, allegedly broken by Gaylord, that was made prior to the decision to forego the opportunity in Saudi Arabia. Mr. Chavoen's statements about "job security" and "long-term" opportunities did not amount to specific promises and did not provide a basis for reasonable reliance.
 
 
 22
 As to the promises allegedly made after Mr. Francis accepted employment with Gaylord, there is no evidence of reasonable detrimental reliance. Mr. Francis merely continued to work at Gaylord; as we have seen, he did not actually forego any alternative opportunity and did not take any other action to his detriment. Cf. Humphrey's, 966 F.2d at 1041.
 
 
 23
 As to Gaylord's promise of assistance in obtaining a green card, the law is clear that a promise of future employment benefits is simply not a promise of job security. See Wing v. Anchor Media Ltd. of Texas, 59 Ohio St.3d 108, 570 N.E.2d 1095 (1991) (a promise of future eligibility to participate in an employer's equity purchase plan held not to be a promise of permanent employment terminable only for cause). Mr. Francis has no justiciable promissory estoppel claim.
 
 
 24
 A. Breach of Contract to Obtain a Green Card
 
 
 25
 Neither does Mr. Francis have any claim for breach of a separate contractual obligation to assist him in obtaining a green card. Assuming that such a contract was made, there is no evidence that Gaylord violated it.
 
 
 26
 Mr. Francis admits that Gaylord could not guarantee him a green card and that he was aware of that fact. Gaylord retained and paid for the services of an immigration attorney selected by Mr. Francis himself. Mr. Francis contacted this attorney frequently to check on the status of his application, and Francis never indicated to Gaylord that he was dissatisfied with the progress of the matter. There is no evidence that Gaylord failed to do anything Mr. Francis or his attorney asked of it, and Mr. Francis has admitted that Gaylord was nothing less than cooperative as far as the green card application was concerned.[2]
 
 B. Discrimination Claims
 
 27
 Ohio Rev.Code Sec. 4112.02 provides in pertinent part as follows:
 
 
 28
 "It shall be an unlawful discriminatory practice:
 
 
 29
 (A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment...."
 
 
 30
 In examining claims of unlawful discrimination udner this statute, Ohio uses the same type of analysis that is applied in cases arising under Title VII of the Civil Rights Act of 1964. See Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission, 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131 (1981). To establish a prima facie case of discrimination, the Title VII caselaw teaches, a plaintiff must show the following:
 
 
 31
 "(1) That the plaintiff is a member of a protected class;
 
 
 32
 (2) That the plaintiff's employment was terminated;
 
 
 33
 (3) That the plaintiff was qualified to perform the job;
 
 
 34
 (4) That the plaintiff was replaced by someone from outside his or her protected class." McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).
 
 
 35
 The district court found that Mr. Francis could not establish the fourth element, because Gaylord never filled the plant manager's position before the plant was closed. We agree.
 
 
 36
 Mr. Francis contends that Stephen White, who was later appointed general manager of Gaylord's plant at Marion, Ohio, should be viewed as his replacement. This argument presupposes an obligation on Gaylord's part to transfer Francis to the Marion plant. Gaylord had no such obligation. Cf. Earley v. Champion Intern Corp., 907 F.2d 1077, 1083 (11th Cir.1990) (when a position is eliminated, a discrimination claim may not be based on a refusal to rehire elsewhere within the company); Simpson v. Midland-Ross Corp., 823 F.2d 937 (6th Cir.1987) (burden on plaintiff in discrimination case is higher when termination was a result of reorganization or reduction in force). The record is clear that Mr. White never became the general manager of the Baltimore facility.
 
 
 37
 Mr. Francis points out, correctly, that failure to establish a prima facie case under the McDonnell Douglas test is not necessarily fatal to a claim of unlawful discrimination. Direct evidence of such discrimination may suffice even when the McDonnell Douglas test is not satisfied. See Kohmescher v. Kroger Co., 61 Ohio St.3d 501, 575 N.E.2d 439 (1991). But the problem Mr. Francis faces in this regard is that there is no direct evidence which would entitle a jury to find that he lost his job because he happens to be British. This country has no significant history of discrimination against the British on account of their race, color, ancestry or national origin, and Gaylord has not been shown to be the "unusual employer" that treats the British less favorably than it treats other people. Cf. Murray v. Thistledown Racing Club, Inc., 770 F.2d 63 (6th Cir.1985).
 
 
 38
 It is true that Mr. Matschullat, whose surname is suggestive of non-British ancestry, made one or two disparaging remarks about Mr. Francis' homeland and used a vulgar adjective to modify the neutral term "Brit." But Mr. Matschullat was guilty of nothing remotely comparable to the stream of racist invective directed at the plaintiff in Boutros v. Canton Regional Transit Authority, 997 F.2d 198 (6th Cir.1993), the case on which Mr. Francis relied most heavily in oral argument, where the racial hostility expressed by the plaintiff's co-workers made it impossible for him to perform his job effectively. Crude and impolite though Matschullat may have been, it would be sheer speculation to conclude that Mr. Francis would have been kept on Gaylord's payroll if only he had been a native-born American with a name of European origin, for example.
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 Mr. Francis does say that he rebuffed inquiries from William York, a headhunter who wanted to help him get another job. There is no evidence that Mr. York had any specific job opportunity in mind, and there is no evidence that Gaylord attempted to dissuade Mr. Francis from trying to get another job through Mr. York or anyone else
 
 
 [2]
 Although Mr. Francis points to a delay of more than a year in the filing of the initial paperwork on his green card application, he fails to demonstrate that the delay was attributable to Gaylord. Francis himself had undertaken the responsibility of forwarding the various papers to the attorney hired by Gaylord. Again, he did not pursue any grievance he may have had in regard to the delay