## Morosetti v. Louisiana Land & Exploration Company

*Thomas H. M. Hough,* for plaintiff.
*E. J. Strassburger,* for defendant.

SILVESTRI, *J.,* July 3, 1986 — Representative plaintiffs brought this civil action as a class action

seeking severance pay benefits on behalf of themselves and similarly situated employees.

On October 30, 1985, this court, after hearing, certified this action as a class action. The class was certified as ". . . all the salaried nonunion employees of Hussey Metals Inc., a wholly owned subsidiary of Louisiana Land and Exploration Company, who upon the sale of certain assets of Hussey Metals Inc. to Hussey Copper Ltd., were not paid severance pay by either Louisiana Land & Exploration Company or Hussey Metals Inc., or both."

The case was tried to a jury and upon the conclusion of the presentation of the evidence by both the representative plaintiffs and defendants, the court directed a verdict in favor of the representative plaintiffs on both liability and damages. As to damages the verdict was ". . . that all nonunion employees of Hussey Metals Inc., formerly a division of Copper Range, are to be paid severance pay based upon one week for each year of service with a maximum of twelve weeks, up to May 18, 1984. A year of service shall be a full year; a partial year is not to be utilized in calculation of the severance pay due. The weekly rate for each aforesaid employee shall be the rate in effect for the week ending May 18, 1984."

Both defendant and representative plaintiffs filed timely motions for post-trial relief. We will address the post-trial motions separately after setting forth the facts as established by the evidence in the case.

Copper Range Company, herein CRC, was a corporation, wholly owned by Louisiana Land & Exploration Company, herein LL&E. Hussey Metals, prior to December 1983, was an unincorporated division of CRC. At all times herein relevant R. D. Allen was the general manager of the Hussey Metals Division of CRC. The Hussey Metals Division operated facilities at Leetsdale, Pa. and at Eminence,

Ky. The Leetsdale facility melted ". . . scrap copper into our casting facility, which we come up with what we call a cake. Maybe a steel worker might remember an ingot. And from there we go through a series of hot rolling and cold rolling. We reduce that cake to a certain gauge in thickness and we sell it to customers in various forms, either bar, sheet stock, plate stock or flat stock."

The Eminence facility ". . . which is primarily 100 percent involved with the production of bus bar, bus bar being those pieces of flat stock of various sizes, widths and lengths, that are specifically used with any electrical field, substations, whether they be a large substation outside that carries city power or minor substations." Eminence was "strictly a one- or two-pass rolling operation." Eminence obtained the flat stock from the Leetsdale facility.

In addition to the production facilities, Hussey Metals Division also had sales offices and/or warehouses in New Jersey, Philadelphia, Pa., New York, Chicago, Ill., Cincinnati, Oh., Missouri and North Carolina.

The Hussey Metals Division of CRC as aforesaid constituted was operated, managed and administered out of Leetsdale, Pa. The CRC office to which the Hussey Metals Division reported was located in Denver, Co. CRC reported to LL&E which was located in New Orleans, La.[1]

Hussey Metals Division of CRC was in the Minerals Division of LL&E. While LL&E had a series of policies providing for benefits for salaried nonbargaining unit employees, LL&E did not have a company-wide policy for its various subsidiaries and divisions relating to severance pay.

---

1. LL&E had other subsidiary corporations and divisions engaged in activities such as lumber, coal mining and gold mining.

Included in [an exhibit] are three sheets of paper, each dated as received July 1, 1983; one sheet is a proposed severance policy, which was never adopted; another sheet is a note from C. A. Zachary, an LL&E officer, to "Bob" (R. D. Allen, general manager of Hussey Metals Division) attaching the proposed severance policy prepared by Lang Glover of LL&E[2]; and a third sheet of paper prepared by Glover justifying the proposed severance policy for the Minerals Division[3], which stated: "Currently, two of the three minerals division operations have severance pay policies. These policies provide one week of pay for each full year of service with a maximum of 26 weeks at one location and 12 weeks at another location. The third location has no severance pay policy."

CRC had a severance policy from about August 1970. Persons who were terminated from the Hussey Metals Division after the institution of said severance pay policy were paid severance pay consistent therewith.

The 1970 severance policy is typewritten, and underneath thereof is handwritten the following:

"Revised this date (September 28, 1982): one week severance per year of service, up to a max of 12 weeks, the above as determined by R. D. Allen, pres. & general manager.

R. L. Peterson"

Severance pay was paid pursuant to the aforesaid handwritten revision in 1982 and 1983.

_____

2. This proposed severance policy was never adopted by LL&E or any subsidiary or division of LL&E or Hussey Metals Division or Hussey Metals Inc.

3. As noted above, Hussey Metals Division of CRC was in the Minerals Division of LL&E.

The Hussey Metals Division of CRC was incorporated as a separate corporate entity under the name of Hussey Metals Inc. in December 1983 and became a wholly owned subsidiary of LL&E. Thereafter, there were no changes in the operation of Hussey Metals Inc. and it continued to "run" as before. Attempts were made by LL&E to sell it as a going concern. On May 14, 1984, several representatives of LL&E went to the Leetsdale facility of what was now Hussey Metals, Inc.[4] and as a result thereof the employees were told that ". . . the Leetsdale facility and branches were in fact shutting down" and that the last day of operation would be Friday, May 18, 1984.

On Friday, May 18, 1984, a memorandum prepared by LL&E, was handed out to the salaried non-union employees. This memorandum, as herein relevant, contained the following:

". . . Severance Pay

The formula and timing for severance pay will be communicated to you on or before June 1, 1984.

. . .

Thomas P. Easter

Manager—Employee Relations

Louisiana Land & Relations Company"

Roy Allen, the general manager of Hussey Metals Division/Hussey Metals Inc. had been able to put together a group over the weekend of May 19 and 20, 1984, to purchase the assets of the Leetsdale and Eminence facilities. The group put together by Allen started to rehire people on May 27, 1984: ". . . Most of the group that was rehired was from the former group of employees."

---

4. Hussey Metals Inc. consisted of all that was Hussey Metals Division as hereinabove set forth.

On May 30, 1984, in response to a request from LL&E, Allen sent it a list of all former Hussey Metals Division/Hussey Metals Inc. employees who were not rehired by the group put together by Allen.

Between May 18 and May 27, 1984, at Leetsdale, a few people remained in the office to handle phone calls; there was also a skelton crew for security; and, a few people were in the office. "As for pay checks from LL&E, everyone was terminated on the 18th." At Eminence, no one lost any work during the week of May 21, 1984, the plant didn't shut down, "They just kept on working."

On June 1, 1984, LL&E sent to all salaried employees a memorandum as to the severance policy it established for salaried nonunion employees as a result of closing of the Leetsdale facility. This severance policy provided for one week of base pay for each full year of service with a minimum of two weeks and a maximum of 26 weeks to all former employees with at least six months of service who were not employed or made an offer of employment as of June 1, 1984. This memorandum, together with a check for the amount of severance pay, was sent to those persons listed on [plaintiff's exhibit]. The salaried nonunion employees who were rehired at the Leetsdale facility and those who continued in employment at Eminence and the personnel at the sales/warehouse were not paid severance pay.

Neither the 1970 severance pay provision nor the September 29, 1982, revision was distributed to the salaried nonunion personnel; however, the staff people in the Hussey Metals Division of CRC had the manual which contained the severance pay provision as revised. Most of the other salaried nonunion personnel were aware of Hussey Metals Division/Hussey Metals Inc. revised severance poli-

cy of a maximum of 12 weeks as well as various levels of severance at other branches of LL&E.[5]

## DEFENDANTS' MOTION FOR POST-TRIAL RELIEF

Defendants in their motion for post-trial relief set forth eight reasons (being reasons 1-6 and 8-9) for entry of judgment in their favor, and, one reason (being reason 7) for decertification of the action as a class action and for a new trial.

Reasons 1 and 2 in the defendants' motion are "boilerplate" and will not be considered, *Carnicelli v. Bartram,* 289 Pa. Super. 424, 433 A.2d 878 (1981); additionally as to reason 2, defendants failed to brief and argue the same and it is deemed to be waived. *Harman v. Chambers,* 358 Pa. 516, 57 A.2d 842 (1948): *Beach's Estate,* 344 Pa. 142, 188 Atl. 108 (1936); *Bell v. City of Philadelphia,* 341 Pa. Super. 534, 491 A.2d 1386 (1985); *Schneider v. Albert Einstein Med. Ctr.,* 257 Pa. Super. 348, 390 A.2d 1271 (1978); likewise, reason 7, which relates to decertification is waived.[6] Reason 9 will not be con-

---

5. The briefs of both counsel contain numerous alleged facts upon which they rely in support of their arguments; many of the facts recited by counsel in their brief were established in the certification proceeding which were not presented as evidence in the instant trial of the case. What we have set forth as the facts established by the evidence in this case has been garnered from only the evidence presented at the jury trial and reasonable inferences therefrom.

6. An order refusing to certify an action as a class action is a final order since it puts the class out of court. *Bell v. Beneficial Consumer Discount Co.,* 465 Pa. 225, 348 A.2d 734 (1975). However, an order of certification is not a final order since defendants may be successful in the defense of the underlying claim.

A proceeding for certification of an action as a class action is a proceeding included in and embraced by the phrase "pre-tri-

sidered for lack of specificity since it is necessary that reasons assigned as error must be set forth with such clarity that both the court and the adverse party may be informed of the import of such reasons and given sufficient opportunity to meet them. *Young Antics, Inc. v. Jaymar Realty Corp.*, 245 Pa. Super. 244, 368 A.2d 385 (1976).

Defendants' brief contains four arguments; arguments I and IV are the same in arguing there was no valid severance pay policy, being reasons 4, 5 and 8 of the post-trial motion; arguments II and III are the same in arguing that the class suffered no severance of employment as raised by reasons 3 and 6 of the post-trial motion.[7]

There is no dispute in this case that the representative plaintiffs and the class members were in the employ of defendants as at-will employees; there is also no dispute that there was no express contract

---

al proceedings" as that phrase is used in Pa.R.C.P. 227.1(b). Thus, the propriety of an order of certification may be questioned and reviewed post-trial after a verdict against the class defendant upon the trial of the underlying substantive claim.

In order to have post-trial review of an order of certification of an action as a class action the party seeking review must not only properly preserve issues at the hearing on certification, but also set forth the issues in the post-trial relief motion as required by rule 227.1, and thereafter brief and argue the grounds properly preserved at the "pre-trial proceedings" and properly set forth in the post-trial relief motion. Defendant herein has not only failed to state that it preserved any issue as to the propriety of the certification of this action as a class action but also failed to comply with rule 227.1(b) relative thereto; in addition, as hereinabove noted, it has also failed to brief and argue the same.

7. We do not consider paragraphs 10 and 11 of defendants' post-trial motion since 10 is not a reason for relief but an attempted compliance with Pa.R.C.P. 227.1(b) and 11 is a reservation to supplement the motion following receipt of the trial transcript which was not done.

bargained for individually or otherwise for severance pay.

The question to be resolved in this case is whether a contract for severance pay can exist in at-will employment where provisions for the same are unilaterally determined by the employer and are set forth in its policy manual.

While the question of whether at-will employment is converted into employment for an indefinite term by way of provisions contained in a handbook to employees has been before our appellate courts, the specific question of whether severance pay provided for in a handbook published by the employer has not.

*Pennsylvania Cases*

The recent Pennsylvania cases dealing with employee handbooks have considered *only* the effect those handbooks have on the at-will employment status of the employees. These cases, discussed below, do not however preclude employee handbooks from creating a contract between the employer and employee. Likewise, the Pennsylvania cases we consider below do not restrict in any way the employer unilaterally establishing policies through employee handbooks which provide the employee with benefits beyond wage compensation. We discuss these decisions solely to demonstrate that our appellate courts have not established a definitive rule concerning the effect of employee handbooks which provide for benefits beyond basic wage/salary compensation in an employment at-will relationship.

In *Richardson v. Charles Cole Memorial Hosp.*, 320 Pa. Super. 106, 466 A.2d 1084 (1983), plaintiff was originally employed at-will and brought the action in assumpsit alleging a breach of contract after she was terminated. Plaintiff contended that an em-

ployee handbook published by defendant containing a policy statement ". . . to provide continual employment to all employees whose work proves satisfactory" established a definite tenure of employment. Citing a federal district court case, affirmed by the 3rd Circuit, and a Kansas case without any allusion to the facts in either, the court held that personnel policies in a handbook do not create contractual rights in the employees and reversed a judgment on the verdict for plaintiff.

In *Banas v. Matthews International Corporation,* 348 Pa. Super. 464, 502 A.2d 637 (1985), plaintiff brought, as herein relevant, an action for breach of contract arising out of his dismissal. Plaintiff's claim was based on the employer handbook issued by defendants which contained a provision stating that an employee could "use our equipment and waste material for your personal work" if given permission by a supervisor. In reversing a judgment on the verdict for plaintiff on the contract action for the reason that the handbook did not contain, expressly or by clear implication, any just cause provision, the court noted that plaintiff proved nothing to avoid the well settled at-will rule. The court went on to say, ". . . If the handbook had contained, if not expressly at least by clear implication, a just cause provision, *then* appellee's claim might have merit; . . . But as we have said, that is a decision that must await a case in which the action is brought for breach of a just cause provision . . . ."

Footnote 11 in *Banas* then follows:

"In *Richardson v. Cole Memorial Hospital,* 320 Pa. Super. 106, 466 A.2d 1084 (1983), an employee sued for breach of a provision in an employee handbook that stated that the employer would "provide continual employment to all employees whose work proves satisfactory"; the handbook further provided

disciplinary procedures and grievance procedures. *Richardson* is different from the employee handbook cases cited above because it holds that a handbook provision purporting to offer employment as long as an employee's performance is satisfactory is not contractually enforceable. 'Such a promise is not . . . a promise to discharge for *cause* or good or just cause only.' *Toussaint v. Blue Cross & Blue Shield of Michigan,* supra, 408 Mich. at 620, 292 N.W.2d at 895. It is instead hardly a promise at all, for the term 'satisfactory' presumes that the employee's 'work [must] prove [ ] satisfactory' to the employer, leaving the employer with discretion to determine what measure of performance is satisfactory. In contrast, the promise to discharge only for cause provides an objective measure by which to evaluate the dismissal: What was the reason for the dismissal, and in the circumstances did the reason amount to just cause? See *Toussaint v. Blue Cross & Blue Shield of Michigan,* supra, 619, 292 N.W.2d at 895."

At this point we note that in *Martin v. Capital Cities Media* (slip opinion Superior Court, 01064 Philadelphia 1985, filed June 12, 1986), the court stated it was not persuaded of *Banas'* interpretation of *Richardson* as set forth in footnote 11 (erroneously stated as footnote 1 in *Martin*) that *Richardson* should be read so narrowly. The *Martin* court's view is that "the *Richardson* panel in fact decided the case on the broader basis that the handbook was not bargained-for because of the employer's unilateral act of publishing it, and therefore it was not legally binding. . . ."

As a trial court we are faced with an apparent conflict between the *Banas* court's and the *Martin* court's view of *Richardson,* and since we cannot follow both we choose to follow *Banas's* view of Rich-

ardson for the following reasons: (1) the *Martin* court stated, ". . . But even if we were not bound by Richardson, we find no merit in appellant's (plaintiffs) contention" and it did not rely on what it believed the *Richardson's* holding to be, (2) the *Martin* court was a panel whereas the Banas court was an en banc court of nine, and, a member of the *Banas* en banc court was Rowley, *J.*, who authored the opinion for the *Richardson* court which was a panel, further, Rowley, in *Banas* "join[ed] in that portion of Judge Beck's concurring and dissenting opinion relative to the contract claim." Judge Beck, in dissenting from the reversal of the contract claim by the majority of the *Banas* court, wrote:

"The Employee Handbook as Unilateral Contract

"It is hornbook law that when a party makes a promissory offer which invites acceptance by performance rather than by return promise, the rendering of the requested performance creates a completed unilateral contact. See Restatement (Second) of Contracts §45 and Comment (a) thereunder (1981). In the employment context, the distribution to an employee or employees of a handbook detailing certain rights, policies and procedures constitutes a unilateral offer of an employment contract with those conditions. The employee supplies the necessary acceptance of the offer and consideration by continuing to perform the duties of his job. . . .

"The same considerations of fairness and equity which have led many of our sister states to reject the position that 'an employee handbook on personnel policies and procedures is a corporate illusion "full of sound . . . signifying nothing," ' Weiner v. *McGraw-Hill Inc.*, 57 N.Y. 2d 458, 462, 443 N.E.2d 441, 443, 457 N.Y.S. 2d 193, 195 (1982), likewise compel me to conclude that employers' statements of policy and procedure contained in handbooks

distributed to employees should be accorded contractual significance.

• • •

"I conclude that the provisions of a handbook distributed to employees can constitute an offer of a unilateral contract which an employee may accept by remaining on the job, and that once accepted, the provisions of the handbook are binding on both parties as conditions of employment until modified by a subsequent offer and acceptance of new conditions. Therefore, I would hold that the trial court did not err in instructing the jury that the Matthews' employee handbook could be construed as part of an employment contract between Banas and Matthews, and that the conduct of Matthews could be considered a breach of contract . . . Since Matthews raises no other challenges to that portion of the jury's verdict which awarded Banas damages for breach of contract, I would affirm that portion of the judgment."

In *Turner v. Letterkenny* Federal Credit Union, 351 Pa. Super. 51, 505 A.2d 259 (1985), an action for wrongful discharge of an at-will employee, although the decision was based on the absence of ". . . what has been viewed in this state as a clearly-mandated public policy," the court noted "there was no contention that a contract, implied or actual, existed between appellee and the credit union. . . ."

*Darlington v. General Electric*, 350 Pa. Super. 183, 504 A.2d 306 (1986) was a wrongful discharge case and in affirming judgment n.o.v. for defendant, the court stated, as herein relevant to the instant case, as follows:

"Since at least 1946, Pennsylvania courts have recognized that even contracts for an indefinite duration can be brought out of the at-will presumption by a showing that the employee gave his employer

additional consideration *other* than the services for which he was hired. See *Lucacher v. Kerson,* supra. The term 'consideration' is not used here as it is in the usual contractual context to signify a *validation* device. The term is used, rather, more as an *interpretation* device. When 'sufficient additional consideration' is present, courts infer that the parties *intended* that the contract will not be terminable at-will. This inference may be nothing more than a legal fiction because it is possible that in a given case, the parties never truly contemplated how long the employment would last even though additional consideration is present. Even so, the at-will presumption would be overcome."

Judge Beck, a member of the *Darlington* court panel filed a concurring opinion in which she stated:

"However, the majority's comprehensive discussion does not address whether employees can establish rights beyond at-will employment by means other than the additional consideration rule. I think they can.

"Relying on an employment manual or handbook provided by the employer, an employee can establish contractual rights which prevent his being treated as an at-will employee subject to dismissal for any reason whatsoever or for no reason at all.

"Provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties. . . . A unilateral contract is a contract wherein one party makes a promissory offer which calls for the other party to accept by rendering a performance. See Restatement (Second) of Contracts §45 and Comment (a) thereunder (1981). In the employment context, the communication to employees of certain rights, policies and procedures

may constitute an offer of an employment contract with those terms. The employee signifies acceptance of the terms and conditions by continuing to perform the duties of his or her job; no additional or special consideration is required. (citations omitted).

"In most of the cases applying the unilateral contract theory, the employee has used the terms of an employee manual as the source of the promises on which he bases his contractual claim."

In *Martin v. Capital Cities Media Inc.,* supra, plaintiff filed a complaint alleging claims, as herein relevant, of breach of contract and wrongful discharge. The court begins its opinion with the following one sentence paragraph:

"This case deals, inter alia, with the contratual significance of an employee handbook."

The handbook alluded to was one issued to the employees by defendant and which was explained to them at a meeting attended by plaintiff. The handbook contained a section titled "standards of conduct," wherein is set forth a list of actions which, if engaged in by an employee, would lead to "disciplinary action." In affirming the trial court's grant of defendant's motion for summary judgment, the Superior Court said:

"Much of the discussion in cases which hold that the handbook has contractual significance concerns an analysis of whether a valid offer and acceptance are present. . . .

• • •

"We need not analyze whether there is consideration here because we find that a reasonable employee in appellant's position would not have understood that in distributing the handbook the employer intended to be legally bound.

"In the instant case, in deciding whether the employer newspaper intended to re-contract with all employees who received the handbook, we must ask whether the employment handbook evidences an intent that it become a legally binding contract that replaces the pre-existing at-will status. This is a question of interpretation and is therefore left to the court.

"The handbook in the instant case does not evidence an intent to convert the employees who received it into employees who could only be discharged for an objective "just cause."

. . .

"In the handbook, we fail to see the definiteness required to overcome the original at-will contract. . . .

. . .

"The handbook provisions in the instant case were given to the employees gratuitously. There is absolutely no indication whatsoever that appellant rendered sufficient additional consideration in exchange for a just cause discharge provision. . . .

"Thus, finding no express promise to convert the at-will employment into employment for an indefinite term . . . appellants' argument must fail.

. . .

"Importantly, we do not mean to say that an employer cannot create a legally binding 'contract' with his employees via an employment handbook. It is for the court to interpret the handbook to discern whether it contains evidence of the employer's intention to be legally bound and to convert an at-will employee into an employee who cannot be fired without objective just cause. . . ."

It is clear that the cases discussed above do not prevent the creation of a contract between the employer and employee in an at-will relationship for

fringe benefits, despite the seemingly positive statements in *Richardson* to the contrary.

We are therefore not burdened by stare decisis in the factual situation herein established by the evidence; without such guideline, however, we must look elsewhere for instruction. We will consider, first, the present day realities of the work force in the United States as a backdrop for the resolution of the questions before us.

## Development and Recognition of Fringe Benefits in At-Will Employment

Brian Heshizer, assistant professor, Department of Management and Labor, Cleveland State University, wrote:[8]

"The transformation from a rural, agrarian society to an urban, industrial society brought about profound change in the character of employment. Self-employment has declined and now over 90 percent of the labor force is employed as wage and salary earners. In the industrial labor market, most people have become dependent solely on employment income so that loss of job threatens the resources required to maintain a reasonable standard of living. The vagaries of the labor market have created the need to provide workers with more security from the uncertainties of modern economic life through social security, workers' compensation, unemployment insurance, and health care programs. This legislation, in addition to others dealing with civil rights, pensions, and safety, reflects the growing concern over worker rights in the labor market.

---

8. The New Common Law of Employment: Changes in the Concept of Employment at Will, 36 Labor Law Journal 95 (1985).

"Along with the change from self-employment to wage-earning employment has been a corresponding shift in employee expectations of job security. Employees are reluctant to change jobs because often that means starting over again after having invested considerable time in building a career in another company. Changing employment frequently means loss of deferred benefits such as pensions and service-related compensation. Loss of employment also has psychological impacts on the worker. Negative effects on self-esteem, health and family life have been associated with involuntary job turnover.

"In addition, employees today expect management recognition of certain fundamental rights because of their service in the organization. These rights include fairness in discipline, opportunities to correct inadequate performance, and consistent application of rules. This expectation of fair, non-arbitrary treatment is mirrored in contemporary society by the emphasis given to individual rights through statutes such as the Civil Rights Act.

"The unrestricted control over employees given employers by the at-will concept no longer comports with an economy where unemployment is concentrated in large corporations and with a value system that stresses protection from arbitrary treatment. Courts in the past paid homage through at-will employment to freedom of contract, business flexibility, and worker mobility. Even in the 19th century, these were concepts inconsistent with the reality of how the labor market functioned. In the 20th century, changes in the economic system, social values, and employee attitudes have made the economic rationale behind Wood's rule even more suspect."

The work force created by the transformation of our socioeconomic base has led to the formation of

at-will employees, cannot afford the cost of the ne-
three well defined groups of workers in the work
force.

One group consists of those persons who have or-
ganized and become members of a bargaining unit
whereby their duly elected and appointed officials
contract for them with the employer for terms and
conditions of employment. This group generally
consists of personnel engaged in production of
goods or the performance of nonmanagement ser-
vices. The group's compensation, benefits, and ten-
ure of employment, inter alia, are fixed by the con-
tract, for the breach of which there is a remedy
which arises out of the existence of the contract.

Another group of employees consists of those who
are the executive personnel of an employer entity.
This group consists of those persons who direct,
control and manage the affairs of the employer enti-
ty. The number and functions of each such person
varies depending upon the size, organizational
structure and kind of business being conducted.
Generally, these persons have individually negotiat-
ed contracts of employment which, like bargaining
unit contracts, set forth the compensation, benefits
and tenure of employment and for the breach of
which there is a remedy which arises out of the
contract.

The third group in the work force consists of
those persons who are hybrids, i.e., they perform
not only management functions, administrative in
nature, but also production or service functions, but
in an immediate supervisory capacity. This group is
neither in a bargaining unit nor in the executive
management group. It has been said that it is this
group that sees to the daily functioning of the "nuts
and bolts" of the business of the employer entity.

This group is "at-will employees" and constitutes two-thirds of the work force.

The executive management group and the bargaining unit group in their bargained-for contracts, in addition to bargaining for a variety of noneconomic issues as well as a base wage and overtime, also negotiate for "fringe benefits." Fringe benefits embrace benefits which, although incapable of precise definition or exact enumeration, are those things which enhance the quality of the worker's life and give the worker a sense of security. Included in fringe benefits are health care, i.e., medical, dental, hospital, prescriptions, etc., provided by or in conjunction with the employers, pensions, which may be contributory or noncontributory, tuition for job advancement of the employee, home sale and home purchase and mortgage differential payments in the event of transfers, legal care, life insurance, sick pay, severance pay, etc.

The fringe benefits provided for in the contracts negotiated with the employer by executive management personnel and by the bargaining units are not gratuities and cannot be unilaterally modified or eliminated by the employer, since they have been bargained for by these employees and once they are agreed upon are effective during the term of the contract, and survive the contract if the conditions for vesting occur during the term thereof. Such is not the case, however, in at-will employment relationships.

Hiring of at-will employees is generally accomplished in several different ways, i.e., response to advertisements, unilateral applications made by persons hoping to become employees, or through employment agencies, etc. Under such circumstances of hiring, fringe benefits are rarely if ever

negotiated or even mentioned. It has been said that employers, especially employers of large numbers of gotiating individual contracts with at-will employees.[9]

Employers, particularly those who have the three groups of aforesaid employees in various numbers, in today's socioeconomic environment, know that fringe benefits are accorded executive management and bargaining-unit personnel by way of negotiated contracts. Such employers also know that at-will employees, unless provision is otherwise made, are without the fringe benefits which are accorded to executive-management and bargaining-unit employees.

Competition between employers in the work place for competent and loyal employees, as well as a stable work force, has resulted in the recognition by employers that to obtain and hold employees, the same concept of fringe benefits must be applied to at-will employees as to the other two groups of employees. In many instances, employers as a matter of course have given to at-will employees not only the same fringe benefits negotiated for the bargaining-unit employees but also the same or substantially the same wage increases.[10]

The employers have sought to delineate the fringe benefits to be accorded at-will employees, there being no express contract therefor, by way of "employee handbooks," "employee manuals," "em-

---

9. One of the advantages of bargaining units to employers is that the employer deals with a single unit for a single employment contract covering large numbers of employees.

10. This practice has led bargaining units, with a varying degree of success, to seek, by legislation and otherwise, payments of a "fee" from nonbargaining unit employees who received the benefits won by the bargaining unit.

ployer policy statements," "employer bulletins," etc., which to eliminate confusion, we characterize herein as "handbook(s)."

*Severance Pay*

In this case we are not confronted by a group of fringe benefits nor are we dealing with a contributory fringe benefit.[11] We are concerned, herein, solely with the fringe benefit of severance pay.

Neither the briefs of the plaintiffs nor of the defendants have revealed any Pennsylvania cases dealing directly with the question of severance pay for at-will employees set forth in a handbook; nor has our own research uncovered any decisions by our appellate courts on the question of whether such provision constitutes a contract. However, courts of other jurisdictions have considered this question.

Severance pay has been described by the court in *Feola v. Valmont Industries Inc.*, 304 N.W. 2d 377 (Neb., 1981) as follows:

"Severance pay, by definition, means compensation given to an employee upon the severance of his employment relationship with his employer. Contrary to the trial court's conclusion, severance pay does not extend the employment period, but terminates it.

"The general effect of severance pay is discussed in Annotation, Construction and Effect of Severance or Dismissal Pay Provisions of Employment Contract or Collective Labor Agreement, 40 A.L.R.2d 1044, 1045 (1955):

---

11. A benefit which is funded by both the employer and the employee in which the respective contributions are fixed by the express contract and in the absence of such a contract, unilaterally by the employer.

" 'Dismissal compensation may be defined as the payment of a specific sum, in addition to any back wages or salary, made by an employer to an employee for permanently terminating the employment relationship primarily for reasons beyond the control of the employee.' Such compensation, more recently often referred to as 'severance pay,' is usually associated with a termination of the employment relationship for reasons primarily beyond the control of the employee: its purpose is to assure a worker whose employment is terminated funds to depend upon while he seeks another job. . . .' (footnotes omitted).

"The term 'severance pay' is defined in *Republic Steel Corp. v. Maddox*, 275 Ala. 685, 689, 158 So.2d 492, 494 (1963), reversed on other grounds, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), as follows:

" 'Severance pay, by its very definition, means compensation due an employee, upon the severance of his employment status with the employer. He must accept his discharge as final before any claim for severance pay can be made. A payment of severance pay by the employer and the acceptance of the same by the employee would, in our opinion, be the complete manifestation of the termination of the employment relationship. A claim for severance pay could never arise during the employment relationship of the parties. . . .'

"It has also been stated that severance pay is a form of compensation for the termination of the employment relation primarily to alleviate the consequent need for economic readjustment.

• • •

"We also note that in Black's Law Dictionary 1232 (5th ed., 1979) the term 'severance pay' is

defined as: 'Payment by an employer to employee beyond his wages on termination of his employment. Generally, it is paid when the termination is not due to employee's fault and many union contracts provide for it.'

In *Bolling v. Clevepak Corp.*, 484 N.E.2d 1367 (Ohio App., 1984), the court said:

"The controversy over the meaning of *Clevepak's* severance provision is prompted by a misconception of the nature of severance pay. *Clevepak* appears to imply that severance payments, like certain 'fringe benefits', are a discretionary largess which employers are free to revoke when business turns bad or when their generosity wanes.

"However, since employers presumably seek, and in fact do seek, loyal, hard-working employees — the kind of employees who can be counted upon to remain with the company during economic upswings and downswings — the modern approach is to view severance pay as 'a form of deferred compensation for continued service,' not as a mere gratuity. . . .

"[6-9] Severance pay is an *earned* benefit, one for which the employees work as much (and as hard) as they work for any other benefit or item of compensation. (citations omitted)."

The Supreme Court of New Jersey in *Owens v. Press Pub. Co.*, 120 A.2d 442 (N.J., 1956) characterized severance pay as being remuneration for service rendered during the period covered by the agreement. *Martin v. Mann Merchandising Inc.*, 570 S.W.2d 208 (Civ. Ct. of App. Texas, 1978) stated that severance pay is usually associated with termination of the employment relationship for reasons generally beyond the control of the employee and its purpose is to assure a worker whose employment has terminated certain funds while he seeks

another job. Joseph DeGiuseppe Jr. wrote in the Fordham Urban Law Journal[12] that:

"Severance pay is a prime example of a benefit which may induce an at-will employee to continue his service with a particular employer. Severance pay is neither analogous to nor a form of unemployment compensation. Rather, it has been characterized as 'a kind of accumulated compensation for past services and a material recognition of these past values'. . . ."

It has also been noted that variance in size of severance payments according to the length of the terminated employee's service is designed to compensate for the increased reliance by and possibly decreased employment prospects for senior employees.

Employees, therefore, may contract for and be entitled to severance pay in spite of their at-will status. In *Pine River State Bank v. Mettille,* 333 N.W. 2d 622 (Minn., 1983) the court said ". . . there is no reason why the at-will [doctrine] . . . needs to be construed as a limit on the parties' freedom to contract. . . ."

Expressing the same thought but more positively, the court in *Helle v. Landmark,* 472 N.E.2d 765 (Ohio App., 1984) said:

"[The] at-will concept is only a description of the parties' prima facie employment relationship. It intimates nothing about subsidiary contractual arrangements to which an employer may legally obligate himself by adding to that new relationship new terms and conditions."

12. The Effect Of The Employment At-Will Rule On Employee Rights To Job Security And Fringe Benefits, Vol. X Fordham Urban Law Journal 1, at page 56.

To the same effect is *Toussaint v. Blue Cross & Blue Shield of Michigan,* 292 N.W. 2d 880 (Mich., 1980) when it stated, "At-will employment is not a substantive limitation on the enforceability of employment contracts but merely a rule of construction."

### Unilateral Contract

There is no dispute that a severance pay policy was contained in the LL&E, Minerals Division Policy manual. Defendants' argument is that they are not bound by the stated severance policy since "plaintiffs have no contractual right to severance pay because the alleged policy upon which they rely was never disseminated and no meeting of the minds (between employer and employee) existed." Basically, defendants argue that there was neither an offer nor an acceptance nor consideration for a contract to have been formed by placing the severance pay provision in the "handbook."

The traditional distinction between "unilateral contract" and "bilateral contract" is that in the former, the offer or promise of one party does not become binding or enforceable until there is performance by the other, whereas in the latter, it is not performance which makes the contract binding, but rather the giving of a promise by one party for a promise of another party. *Scholtes v. Signal Delivery Services Inc.,* 548 F.Supp. 487 (D.C.Ark., 1982). Judge Beck in her dissenting opinion in *Banas,* set forth the concept of a unilateral contract as it exists in Pennsylvania when she wrote, "It is hornbook law that when a party makes a promissory offer which invités acceptance by performance rather than by return promise, the rendering of the requested performance creates a completed unilateral

contract. See Restatement (Second) of Contracts §45 and Comment (a) thereunder (1981)."

There is no question that at-will employees and the employer could have, one-on-one, bargained for fringe benefits which are contained in a handbook. The fact that they did not so bargain does not invalidate handbook provisions therefor. The court in *Toussaint v. Blue Cross & Blue Shield of Michigan,* supra, rather aptly conveyed the effect of an employer's published statement of policy in stating:

"While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation."

As defined in Restatement (Second) of Contracts, section 2:

"(1) A promise is a manifestation of intention to act or refrain from acting in a specified way, *so made as to justify a promisee in understanding*

*that a commitment has been made.*" (emphasis added).

The employer's handbook containing fringe benefits for at-will employees is not only a document "instinct with an obligation," but also an expression of the employer's "commitment."

In addition to the foregoing concepts, the at-will rule which permits an employer to discharge an employee "for any reason or no reason" also allows an at-will employee to quit the employment "for any reason or no reason."

The above considerations have resulted in the courts of other jurisdictions finding that fringe benefits set forth in handbooks, such as severance pay, result in enforceable contracts once all the conditions for payment thereof are met.

In *Anthony v. Jersey Central Power & Light Co.,* 143 A.2d 762 (N.J. 1958), the court, in relation to "handbooks," stated:

"Publication and distribution of policies and rules is not made in contemplation that acceptance of the published offer was susceptible of acceptance by rendition of a promise or undertaking by the employee in exchange — i.e., the consummation of a bilateral contract.

"Its natural construction is the submission of an offer in return for rendition of services in employment by the employee until the occurrence of the condition stipulated — a unilateral contract.

"This is the general present-day construction of employment stipulations for severance pay, bonuses or similar incentive plans."

*Dulaney Foods Inc. v. Ayers,* 260 S.E.2d 196 (Va., 1979) states that severance pay is a matter of contract between the parties and therefore the question of reliance is not significant. Promise of severance pay amounts to an offer which if accepted by perfor-

mance of service fulfills the legal requirements of a contract.

*Chinn v. China National Aviation Corp.*, 291 P.2d 91 (Calif., 1955) held that a severance pay plan is to be considered, not a mere offer of a gift, but a unilateral contract offer which is accepted if the employee continues in employment.

*Bolling v. Clevepak Corp.*, supra, holds that an offer is made if the offeree is justifed "in understanding that a commitment has been made," whether the representation is given alone or with other assurances.

Acceptance of the employer's handbook offer of severance pay occurs by the employee rendering performance, i.e. by the employee retaining his employment with the employer. *Helle v. Landmark,* supra. An additional compensation plan by way of severance pay, offered by an employer in a "handbook" and impliedly accepted by an employee by remaining in employment, constitutes a contract. *Bolling v. Clevepak Corp.*, supra. Employees remaining in the employ of the employer, until the occurrence of the stipulation for severance pay, matured the contractual obligation of the employer begun by the proposal effected by its distribution. *Anthony v. Jersey Central Power & Light Co.*, supra.

Consideration for a unilateral contract for severance pay is to be found in the employee's retention and continued performance of his employment; a single performance may furnish consideration for multiple promises. Restatement (Second) of Contracts, §80, Comment (a). Handbook provisions relating to such matters as bonuses, severance pay and commission rates are enforceable without the need for additional, new consideration beyond the services to be performed. *Helle v. Landmark,* supra.

Since the "any reason or no reason" incident of at-will employment applies equally to the at-will employee, thus allowing the employee to leave the employment at any time, the employee's continuance in employment is consideration for the unilateral contract offering fringe benefits by way of a "handbook" which is accepted by performance and retention of employment by the employee. *Hercules Powder Co. v. Brookfield*, 53 S.E.2d 804 (Va., 1949); *Anthony v. Jersey City Power & Light Co.*, supra.

Consistent with the employer's right to modify, limit or withdraw offered fringe benefits, the employer can only do so prior to the employee completing the conditions or act called for in the offer. The offer in such cases constitutes a promise for a completed act. However, such modification, limitation or withdrawal of fringe benefits prospectively is without prejudice to rights which may have accrued prior to the change. The employer is not free to disregard its contractural obligations merely because it is economically avantageous to do so. *Helle v. Landmark,* supra; *Schofield v. Zion's Co-op Merchantile Institution,* 39 P.2d 342 (Utah, 1934).

The extent of employee's knowledge of the fringe benefits set forth in the "handbook" is not a significant criteria in determining whether there was acceptance of the offer by the employee. *Dangott v. A.S.G. Industries Inc.,* 558 P.2d 379 (Okla., 1976) held that knowledge of the offer and details thereof may be relevant when dealing in other contract areas such as sales, real estate or personalty or warranty; when dealing with employment contracts concerning nonunion or administrative personnel, however, the contract must be construed most strongly against the employer. The *Dangott* court held, consistent with the foregoing, that distribution of the handbook only to supervisory parties can be

for no other purpose except to give notice and impart knowledge of it to the employees and that publication of a policy is the equivalent of constructive knowledge on the part of all employees not specifically excluded.

"Notice of a company's benefit policy may be disseminated to its employees in a number of ways. Employees need not have examined the actual policy in a personnel manual or some other employee handbook prior to or during their employment with an employer in order for there to be an offer capable of acceptance. Aside from actually reading the policy, employees also may learn of a benefit from company notices, from talking to other employees, or from prior occasions where the benefits in question had been given to eligible employees under similar circumstances."[13]

Where an employer's policy, however disseminated, is found to be a valid offer to pay a benefit, if the employees continue their retention and performance of their employment, there is acceptance and consideration and there is a valid contract. See *Hinkelday v. Cities Service Oil Co.,* 470 S.W. 2d 494 (Mo., 1971); *Ehrle v. Bank Building & Equipment Corp. of Am.,* 530 S.W. 2d (Mo., 1975).

It is not sufficient for an employee to establish the existence of a contract for a particular fringe benefit consistent with the principles hereinabove set forth. A fringe benefit may be determined to be a contract but still be denied an employee because the employee does not qualify under the stated provisions for payment thereof. *MacDougal v. Sears, Roebuck & Co.,* 624 F. Supp. 756 (E.D. Tenn., 1985). When the employee has conformed to all the conditions to be entitled to the benefit, the right thereto vests. In

13. Fordham Urban Law Journal, supra, at 51-52.

*David v. Veitscher Magnesitwerke Actien Gesellschaft,* 348 Pa. 335, 35 A.2d 346 (1944), the court said that while an employee's right to a pension was inchoate before he had complied with the conditions entitling him to benefits, thereafter it vests.

A vested right is the power to do certain actions or possess certain things lawfully, and is substantially a property right. It may be created either by common law, by statute or by contract. Once created, it becomes absolute. *Oklahoma Water Res. Bd. of Central Okl. M.C. Dist.,* 464 P.2d 748 (1969); *Hercules Powder Co. v. Brookfield,* supra; *Schofield v. Zion's Co-op Mercantile Institution,* supra; *Linaka v. Fireman's Pension Fund,* 356 Pa. 459, 31 A.2d 122 (1943); Black's Law Dictionary (5th Ed., 1979), p. 1401-1402. Where a benefit has vested in an employee under the terms and conditions set forth in the "handbook," the employer cannot work a forfeiture thereof. *Berteau v. Wiener Co.,* 362 S. 2d 806 (La. App., 1978).

*Conclusion*

Returning to the established facts in this case as hereinabove set forth, defendants established a severance policy in August 1970 which was modified in September 1982. The severance policy of August 1970 was followed by payment to employees thereunder. After the severance pay was revised in September 1982, severance pay was also paid under that policy. Both the severance pay provision of 1970 and the 1982 revision were set forth in LL&E Mineral Division Policy Manual. Although the manual was not distributed to each employee it was given to staff personnel, it was no secret and was available to all employees. The employees were generally aware of a severance pay policy by way of conversa-

tions with other employees as well as severed employees who received severance pay. The representative plaintiffs and the class members continued in and performed their employment subsequent to the revised severance pay policy of September 1982. The severance pay policy of September 1982 is unambiguous; it states, "One weeks severance per year of service, up to a max of 12 weeks" and when read in conjunction with the replaced policy, under which it appears, it is clear that it provides for one week's pay for each year of service with a maximum payment of 12 weeks' pay.

The foregoing facts establish a clear and definite offer, knowledge, acceptance thereof and consideration, which consistent with the above cited principles of law, constituted a contract between defendants and the class plaintiffs for payment of severance pay according to the terms set forth in LL&E's Mineral Division Policy Manual.

Accordingly, defendants' argument that there was no contract for payment of severance pay is without merit.

## Effect of Handbook Provision on Policy

The next argument of defendants is that the alleged policy relied upon by the court was invalid because of a procedural defect. This argument implicitly admits that there existed a severance pay provision at the times herein relevant, that being the severance policy as revised on September 29, 1982.

The LL&E Minerals Division Policy Manual contained policy number HR10, effective November 1, 1980, titled "Policy on Policies," which provides:

"Where division-wide policies do not address local situations and circumstances, each location may de-

velop and implement additional necessary policies. These policies should be reviewed and approved by the Denver office prior to implementation."

There was in the manual a provision titled "Copper Range Severance Policy Salaried Nonunion." The evidence is that this was established in August 1970. The Policy on Policies was not effective until November 1, 1980, thus it has no application to the August 1970 severance pay provision. Since Hussey Metals Division was an unincorporated division of CRC, the August 1970 severance pay provision covered its salaried nonunion employees.

The evidence further establishes that LL&E did not have a division-wide policy relating to severance pay. In addition to testimony to this effect, there is also the report of Mr. Glover, which states:

"Currently, two of the three minerals division operations have severance pay policies. These policies provide one week of pay for each full year of service with a maximum of 26 weeks at one location and 12 weeks at another location. The third location has no severance pay policy."

Hussey Metals Division, being a part of the minerals division, was empowered by the Policy on Policies provision to "develop and implement additional necessary policies."

While the language, "These policies should be reviewed and approved by the Denver office prior to implementation" appears in the Policy on Policies, there is no provision as to how approval "by the Denver office prior to implementation" was to be manifested. The evidence clearly establishes that the revised severance policy of Hussey Metals Division/Hussey Metals Inc. was effective September 29, 1982; the evidence also establishes beyond cavil that the severance policy, as revised on September 29, 1982, was followed thereafter and sever-

ance pay paid thereunder,[14] from which it is reasonable and logical to infer that approval of the September 29, 1982 severance pay provision was given.[15]

There is no merit to the argument that a procedural defect invalidated the severance pay provision of September 29, 1982.

## Was There a Severance?

Defendants further argue that the class plaintiffs did not suffer a severance of employment in that they were retained by the purchaser of the Leetsdale, Eminence and the sales/warehouse facilities, and, in addition thereto, the severance pay provision excluded severance payments where employment was retained following the sale of a facility. For the following reasons there is no merit in this argument.

There is no dispute that LL&E caused the incorporation of Hussey Metals Inc. in December 1983. Hussey Metals Inc. was identically the same as the Hussey Metals Division of CRC in plant, equipment assets, production, distribution, sales and personnel. LL&E for some time prior to December 1983 had been attempting to sell the Hussey Metals Division of CRC and incorporated it as a wholly owned

---

14. While there is some evidence that two or three terminated employees received more in severance pay than the severance pay provision provided, there is no evidence that any received less. Giving, in isolated instances, a benefit greater than that provided for does not affect the validity of the basic contract for the payment of the benefit.

15. There is evidence that in July 1983 Glover of LL&E was aware of Hussey Metals Division severance pay provision and alluded to it in his report and there is no evidence that it was disapproved or rejected by LL&E or CRC.

subsidiary of LL&E to facilitate its sale as a going concern.

The evidence at trial in this case establishes that on May 14, 1984, LL&E directed the "shutting down" of the Leetsdale facility on May 18, 1984, a Friday. The salaried nonunion employees were notified in writing by LL&E that the Leetsdale operation was being discontinued as part of ". . . LL&E's plan to dispose of its minerals operations" and that ". . . LL&E is currently attempting to sell the assets of Hussey Metals Inc." The assets of Hussey Metals Inc. included the Leetsdale facility, the Eminence facility and the sales/warehouses facilities.

Prior to May 18, 1984, Allen was attempting to purchase the Hussey Metals Inc. operation. On May 18, 1984, Leetsdale was closed and LL&E made its final payroll. Over the weekend of May 19 and 20, 1984, Allen succeeded in putting together a group to purchase the Hussey Metals Inc. operation. The purchasing group was a partnership using the name Hussey Copper Ltd. Hussey Copper Ltd. began operating the Leetsdale facility on May 27, 1984, and began hiring personnel on and after May 24, 1984. After LL&E closed Leetsdale on May 18, 1984, a few people remained at the facility prior to Hussey Copper Ltd. taking over, to answer the telephone, provide security and do work in the office. The Eminence facility did not cease working at any time; the employees at Eminence reported for work on Monday, May 21, 1984, and continued to work each day thereafter.[16] The Hussey Copper Ltd. partnership acquired over the weekend of May 19 and

16. There is no evidence by whose authority the work continued uninterrupted. The fair inference is that it emanated from the Allen Group which on May 19 and 20 committed to the purchase of the Hussey Metals Inc. assets.

20, 1984, the Leetsdale facility, the Eminence facility and the sales/warehouse facilities of Hussey Metals Inc. and by May 27, 1984, had rehired the same salaried nonunion personnel who just prior thereto worked for Hussey Metals Inc./Hussey Metals Division of CRC except those listed on [an exhibit].

There is no evidence that the sale of Hussey Metals Inc. was a sham transaction with LL&E still controlling the purchaser, nor is there any evidence that the transaction was merely a reorganization and realignment of the structure of LL&E with its subsidiaries and divisions, with LL&E still in control of the purchaser. The evidence is that LL&E and Hussey Metals Inc. divested themselves of the assets of Hussey Metals Inc., relieving themselves of any responsibility for and control over the salaried nonunion employees after May 18, 1984.

There is a severance of employment of employees when the employer sells its assets or the assets of a division or subsidiary to another entity unrelated to the employer entity even though the employees of the employer seller continue, uninterrupted, in the employ of the purchaser entity. See *Anthony v. Jersey Central Power & Light Co.*, supra; *Hinkelday v. Cities Service Oil Co.*, supra; *Chapin v. Fairchild Camera & Instrument Corp.*, 31 Cal. App. 3d 192, 107 Cal.Rptr. 111 (1973); *Mace v. Conde Nast Publications Inc.*, 247 A.2d 360 (Conn., 1967); *Clarke v. Brunswick Corp.*, 211 N.W. 2d 101 (Mich. App., 1973).

Severance pay in a contract for the payment thereof is payable according to the terms of the contract at the time there is fulfillment of the conditions of the contract. While the within severance pay provision is simplistic, it does not mean it is indefinite. The provision is that severance pay will be paid upon severance, i.e., when the employee is no long-

er in the employ of the employer; the amount of severance pay is to be determined at the time of severance based upon the weekly pay and the number of whole years of service at the time of severance.

There being a severance of employment of the class members with Hussey Metals Inc., they became entitled to severance pay as we hereinabove held. The only severance pay provision in effect as to the class members was the severance policy, as revised September 29, 1982, which became vested in the class members on May 18, 1984, when they were severed from the employment and control of the defendants.

Defendants argue that since severance pay is to enable employees to bridge the gap between termination and obtaining other employment, the class members who continued to work or were hired after a few days by the Allen group are not entitled to severance pay. Defendants overlook the fact that there may be other reasons for severance pay, such as reward for the years of service, or a method of sharing in a sale price which is enhanced by virtue of the facility being a going concern, or deferred nonaccumulated compensation for past services. The evidence in this case is devoid of the reasons for the severance policy of Hussey Metals Inc./Hussey Metals Division which, in any event, under the acts herein, are not relevant:

LL&E was aware of the severance pay provision of September 29, 1982, prior to May 18, 1984, by reason of severance pay being paid thereunder, the study and report of 1983 of Mr. Glover, and LL&E's pre-sale discussions with Hussey Metals Division/ Hussey Metals Inc. personnel. Despite this knowledge, neither LL&E nor Hussey Metals Division/ Hussey Metals Inc. did anything to modify or revoke it.

The fact that LL&E and Hussey Metals Inc. did formulate a severance policy on June 1, 1984, with conditions, demonstrates that they knew how to limit entitlement to severance pay. LL&E and Hussey Metals Inc. want this court to rewrite the terms of the severance pay provision in effect on May 18, 1984, something which they could have done prior thereto. We do not have either the right or the power to add to or detract from the severance pay policy when it became vested on May 18, 1984, but we do have the power to prevent an employer's unilaterally working a forfeiture thereof.

## PLAINTIFFS' MOTION FOR POST-TRIAL RELIEF

Representative plaintiffs' motion for post-trial relief seeks entry of judgment in their favor. This is inappropriate since a verdict has already been entered in their favor. *DeFazio v. Labe,* 352 Pa. Super 120, 507 A.2d 410 (1986). The thrust of plaintiffs' post-trial motion is that the court erred in the amount of damages awarded. We treat representative plaintiffs' post-trial motion as a request for a new trial limited to damages only.

The representative plaintiffs have set forth five paragraphs in their post-trial relief motion.

Paragraph 1 has five subparagraphs ((a) through (e)) which are merely supportive of the basic assertion that the damage award should have been one week's pay per year of service with a maximum of 26 weeks consistent with the severance policy announced by LL&E on June 1, 1984.

What we have said hereinabove in disposing of defendants' post-trial relief motion relative to what the terms of the severance pay provision was as of May 18, 1984, at the time of vesting is also dispositive of this claim of the representative plaintiffs.

Paragraph 2 is that the court erred when it fixed the weekly pay rate of severance pay at the rate in effect on May 18, 1984, the date of severance rather than ". . . the normal base rate for each plaintiff and/or class members." There was no evidence presented by the representative plaintiffs as to what "the normal base rate" was as being an amount different than the weekly rate in effect on May 18, 1984; additionally, at the time the court granted the directed verdict in favor of the representative plaintiffs both as to liability and damages, they did not object or take exception to the damage award formula, thus failing to preserve the issue. *Dilliplane v. Lehigh Valley Tr. Co.,* 457 Pa. 255, 332 A.2d 114 (1974).

Paragraph 3 of plaintiffs' post-trial relief motion is an attempted compliance with rule 227.1(b) while paragraph 5 is merely a reservation to supplement the post-trial relief motion upon receipt of the transcript which was not done.

Paragraph 4 of the motion is an expression of intent to seek reasonable attorneys' fees from defendants pursuant to the act of July 14, 1961, P.L. 637, 43 P.S. §260 et seq. The matter of attorneys' fees has neither been presented to nor passed on by the court, thus it is not only premature but wholly inappropriate at this stage to be included in the post-trial relief motion and accordingly will not be considered.

The post-trial relief motion of the representative plaintiffs is devoid of merit.

## O R D E R

And now, this July 23, 1986, after argument, consideration of the briefs of the parties and a review of the record, it is ordered as follows:

(1) The motion of the defendants for post-trial relief is denied.

(2)  The motion of the representative plaintiffs for post-trial relief is denied.

(3)  The prothonotary is directed to enter judgment on the directed verdict in favor of the representative plaintiffs and against the Louisiana Land and Exploration Company and Hussey Metals Inc. and HM Copper Inc., upon payment of the appropriate fee, if any.