WILLEY, Appellee,

v.

BLACKSTONE, Appellant.

[Cite as *Willey v. Blackstone,* 180 Ohio App.3d 303, 2008-Ohio-7035.]

Court of Appeals of Ohio,
Fifth District, Guernsey County.

No. 07–CA–40.

Decided Dec. 22, 2008.

Tribbie, Scott, Plummer & Padden and Stephanie L. Mitchell, for appellee.

Michael C. Johnson, for appellant.

EDWARDS, Judge.

{¶ 1} Defendant-appellant, Bradley Blackstone, appeals from the October 3, 2007, judgment entry of the Guernsey County Court of Common Pleas. Plaintiff-appellee, Darwin Willey, has filed a cross-appeal.

## STATEMENT OF THE FACTS AND CASE

{¶ 2} Appellant Bradley Blackstone was married to appellee Darwin Willey's daughter Carey. Appellee testified that in March 1998, he was approached by appellant and Carey regarding a loan. The two wanted a loan from appellee to purchase a modular home to place on property that they owned in Guernsey County. Appellee testified that he, Carey, and appellant entered into an oral agreement pursuant to which appellee would use his own property "as security to purchase this double-wide." Appellee testified that he obtained a loan for $43,804 from Alternative Lending in August 1998 with an annual percentage rate of 15.7346 percent, using his house as collateral, and that appellant and Carey agreed to pay him $600 a month as a mortgage payment. Appellee, when asked, testified that appellant was aware of the monthly mortgage payment.

{¶ 3} Of the $43,804, appellee retained $2,518.88. The following testimony was adduced when appellee was asked how much was paid to others:

{¶ 4} "A.    $41,285.12.

{¶ 5} "Q.    And those others this document refers to, who would those individuals consist of?

{¶ 6} "A.    Say that again?

{¶ 7} "Q.    Who else—who was this money paid to?

{¶ 8} "A.    Well, the $30,000 and—30,285 was paid to buy the house, the double-wide.

{¶ 9} "Q.    Okay.

{¶ 10} "A.    And that was to Carey, to Carey and Brad Blackstone, and the name of the company they bought the house from.

{¶ 11} "Q.    Okay.

{¶ 12} "A.    And then the 8,000 was to Carey Blackstone and that's to redo the basement and landscaping around the house."

{¶ 13} Appellee, when questioned about whether he had a discussion with appellant and Carey about the interest that would be charged on the loan and how it would be repaid, testified that the interest was to be included with the loan.  He further testified that appellant and Carey agreed to refinance in 2001 and pay off the mortgage.

{¶ 14} According to appellee, other than missing three payments, appellant and Carey made the payments in a timely manner.  He also testified that appellant was present when the payments were made and that he sometimes received checks from appellant.

{¶ 15} Testimony was adduced at trial that on or about May 8, 2001, a fire destroyed the home owned by Carey and appellant.  The parties rebuilt a house on the property with the insurance proceeds and also each received $24,000 (for a total of $48,000) for the contents.

{¶ 16} A judgment entry decree of dissolution was filed on September 18, 2001, dissolving the marriage between Carey and appellant.  Their separation agreement states as follows:

{¶ 17} "A.    Real Estate:

{¶ 18} "The parties represent that they own real estate located at 6973 Tracey Road, Uhrichsville, Ohio. Wife shall quit claim said real estate to the Husband, free and clear of any claims of the Husband.  Husband shall make the payments on the mortgage encumbering the real estate through American General Finance, and shall make every effort to refinance said mortgage into his name only.

{¶ 19} "Husband shall pay to the Wife the sum of $10,000.00 at the time the minor child, Stephen S. Blackstone reaches the age of 18 years."

{¶ 20} At the bench trial, appellee testified that "I don't think my name is mentioned in there [the Separation Agreement]; just for him [appellant] to continue making the mortgage payments."

{¶ 21} Appellant continued making the $600–a–month mortgage payment to appellee until September 29, 2003, when he made a last payment of $300. Appellee testified that he did not receive any payments after that date. When asked what the status of the mortgage on his own home was at the time of the trial, appellee testified that it was in foreclosure and that the current mortgage balance was $95,650. He also agreed that this amount was the amount that he was asking the trial court to order appellant to pay to him.

{¶ 22} On cross-examination, appellee agreed that there was no written agreement between himself and appellant or Carey to repay the money to him. When questioned about the above cited language from the separation agreement, he agreed that American General Finance had nothing to do with the loan that appellee took out himself and the money that he provided to Carey for the purchase of the doublewide. Appellee further agreed that there was nothing in the separation agreement stating that a mortgage was to be paid to him or mentioning him or any debt owed to him.

{¶ 23} Appellee, on cross-examination, also testified that he never contacted appellant after appellant's marriage to Carey was dissolved to inform appellant that because he was keeping the house, he needed to pay appellee. Nor did appellee provide appellant with anything in writing stating what was owed by appellant to him.

{¶ 24} Appellee further testified that after the fire destroyed the doublewide, he met with appellant and Carey and asked them how the debt to him was going to be handled. The following testimony was then adduced:

{¶ 25} "A. And they continued to—they said: Well, I am going to try to refinance it. My understanding, they couldn't refinance it, they had to roll the house and the land together. And when that happened, the refinance—Carey, after the divorce, she had to do a quit-claim deed or had to sign her interest over to Brad, and then it was supposed to be taken care of. I never—

{¶ 26} "Q. Their agreement doesn't show how you were to be taken—their separation agreement doesn't refer to how you were to be taken care of; does it?

{¶ 27} "A. The understanding I had was the—

{¶ 28} "Q. I am not asking your understanding, I am asking: The agreement doesn't provide for that; does it?

{¶ 29} "A.   Yes, he was to continue to pay the mortgage.

{¶ 30} "Q.   Okay. Now, when did you give Brad anything in writing to show the balance that was owed for him to go get it refinanced?

{¶ 31} "A.   He never asked for it * * *."

{¶ 32} On cross-examination, appellee testified that the check for $30,285.12 for the modular home was made out to Carey and 4–D Manufactured Home and that appellant's name did not appear on the check.

{¶ 33} On redirect, appellee testified that after the modular home was destroyed by a fire, appellant and Carey received $50,000 in insurance proceeds and also got the house replaced.   He testified that he did not receive any of the $50,000 and that when he loaned the money to appellant and Carey, he intended the loan to be repaid in full including the interest that was accumulated on the mortgage.

{¶ 34} At the bench trial, appellant testified that he and Carey purchased property containing a basement and that they intended to move or build a house on the basement.   He testified that Carey, who was a loan closer, called him one day and told him to come out to their property.   When appellant arrived, he found a modular home on the property.   Appellant testified that he "guessed she [Carey] went and talked to her dad [appellee] and purchased a modular home." He denied ever talking to appellee about obtaining a loan from him to purchase the home or ever discussing the terms of the loan with appellee.   Appellant testified that he was aware that payments were being made to appellee and that the monthly payment "went up due to something with the—the buying and selling of the loan, the interest * * *."

{¶ 35} Appellant further testified that after a fire destroyed the house in May 2001, his financial records were destroyed.   He agreed that he had paid appellee a total of $39,300.   Appellant testified that after the fire, in addition to money to rebuild the house, he and Carey received $48,000 for the contents and that they split the money evenly between them.   When questioned about the separation agreement, appellant testified that it made no provision for appellee to be repaid and that when referring to repayment of a mortgage, the separation agreement was referring to a mortgage through American General that was to be refinanced in appellant's own name.   Appellant testified that after his marriage to Carey was dissolved, he continued paying appellee until he thought he had reached the final amount.

{¶ 36} The following testimony was adduced when appellant was asked if he previously had attempted to refinance to get money to repay appellee:

{¶ 37} "A.   Only when I refinanced American General, and I couldn't get a figure from Carey or Darwin [appellee] on what was owed.

{¶ 38} "Q. Explain that to me. You couldn't get a figure?

{¶ 39} "A. No one could come up with a figure that was owed to Darwin. I could not get any documentation until this court procedure about this loan. I couldn't get a straight answer from her or him as to what was owed, what the payments were, who it was to."

{¶ 40} However, appellant admitted that there was testimony from a hearing before a magistrate in October 2002, in appellant's domestic-relations case, that appellant was denied refinancing because he wanted to include in the refinancing an additional $30,000 to $40,000 to pay off the loan to Carey's parents. He testified that he refinanced the property after January 2, 2003, to take Carey's name off of the property.

{¶ 41} Appellant also testified that he had no idea what he and Carey had paid for the modular home because he was not in charge of their finances and that he was unaware what interest rate appellee may have been charging them. When asked, he testified that the modular home and the land were both in Carey's name only because "[i]t was her credit, her loan." He also testified that he did not know that the loan was to be paid off in three years and that although he asked appellee for a total that needed to be repaid, he never received one. According to appellant, he heard that appellee was owed anywhere between $38,000 and $52,000.

{¶ 42} On cross-examination, appellant testified that he became aware of the loan from appellee the morning after he came home and found the modular house on the property. He testified that he was advised that he and Carey had to repay appellee for the home and that monthly payments were made to appellee. He also testified that in accordance with the separation agreement, he refinanced the loan with American General in 2002 and that Carey's name was taken off the loan. Appellant also admitted that he knew that there was no requirement in the separation agreement that he repay Carey and that he still felt an obligation to continue paying appellee. He also testified that he continued making payments to appellee until September 2003, and then stopped "[b]ecause we couldn't come to terms of what the loan was, how much it was." Appellant testified that he did not anticipate interest would have accumulated because he "wasn't a participant to that" and that he contacted appellee and asked him for paperwork showing how much was owed. Appellant testified that while Carey had an agreement with appellee, he did not.

{¶ 43} At the bench trial, appellant testified that he owed $116,000 for the property and that he had paid $80,000 for the land in 1998. He testified that the $116,000 was a result of the original $80,000 plus refinancing for a spring and some repairs to the basement.

{¶ 44} On June 6, 2006, appellee filed a complaint against appellant for breach of contract and unjust enrichment. Appellee, in his complaint, alleged that he had been damaged in an amount exceeding $50,000 "for the mortgage payments due and not paid, the principal owed on said mortgage, interest, attorney fees and costs." Appellee sought judgment against appellant in an amount in excess of $50,000 plus attorney's fees and costs.

{¶ 45} Following a bench trial held on October 1, 2007, at which the above testimony was adduced, the trial court, pursuant to a judgment entry filed on October 3, 2007, found that there was not a valid oral contract between appellant and appellee. However, the trial court found that appellant had been unjustly enriched. The trial court, in its entry, stated:

{¶ 46} "This Court concludes as a matter of law that the Plaintiff has established by the requisite burden of proof the elements of unjust enrichment based upon the facts [before] this Court. The court concludes that the Defendant has received the benefit of the home on the property which has been replaced by proceeds of the fire insurance. He has the knowledge that the benefit was derived from the Plaintiff and the retention of the benefit by the Defendant under the circumstances of this case to be unjust without proper payment.

{¶ 47} "The court concludes as a matter of law that the Defendant attempted to borrow between $30,000.00 and $40,000.00 in January 2003 thereby establishing what he believed he owed at that time on the obligation to the Plaintiff. The court finds that the value of the benefit to the Defendant based upon the evidence before the Court would be $36,000.00 ($116,000.00 owed on the mortgage less $80,000.00 purchase price of the land). The Court further concludes from the facts, however, that he is obligated to pay his ex-wife, the daughter of the Plaintiff, $10,000.00 for her interest which would reduce the value to him to $20,900.00."

{¶ 48} The trial court awarded appellee judgment against appellant in the amount of $20,900 plus interest.

{¶ 49} Appellant now raises the following assignment of error on appeal:

{¶ 50} "The trial court abused its discretion in making a monetary judgment in the amount of $20,900.00 against defendant as such judgment was against the manifest weight of the evidence."

{¶ 51} Appellee raises the following assignments of error on cross-appeal:

{¶ 52} "I. The trial court erred in concluding that appellant failed to establish, by a preponderance of the evidence, a manifestation of mutual assent and bargained for legal benefit that would permit the court to find a valid oral contract.

{¶ 53} "II. The trial court properly determined defendant to have been unjustly enriched but erred in determining that the appropriate amount of damage was $20,900.00 rather than $95,643.00 as sought by appellee."

### First Assignment of Error on Cross–Appeal

{¶ 54} Appellee, in his first assignment of error on cross-appeal, argues that the trial court erred in finding that there was no valid oral contract between appellant and appellee. We disagree.

{¶ 55} The elements of a contract include the following: an offer, an acceptance, contractual capacity, consideration (the bargained-for legal benefit or detriment), a manifestation of mutual assent, and legality of object and of consideration. *Kostelnik v. Helper,* 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. See also *Helle v. Landmark, Inc.* (1984), 15 Ohio App.3d 1, 15 OBR 22, 472 N.E.2d 765. A party asserting a contract must prove by a preponderance of the evidence the existence of the elements of the contract. *Cooper & Pachell v. Haslage* (2001), 142 Ohio App.3d 704, 707, 756 N.E.2d 1248.

{¶ 56} The trial court found, and we concur, that appellee failed to establish by a preponderance of the evidence "a manifestation of mutual assent and bargained-for legal benefit." As is stated above, appellant testified that he never spoke with appellee about obtaining a loan from him and that he arrived home one day to find out that Carey had purchased a modular home with her father's financial assistance. Appellant also testified that he never discussed the terms of the loan with appellee before the home was purchased and that he did not sign any type of note or mortgage regarding the loan. The documentary evidence presented to the trial court shows that the check for $30,285.12 for the modular home was made out to Carey and 4–D Manufactured Home and that appellant's name did not appear on the check. Nor did appellant's name appear on the check for $8,000 to redo the basement and for landscaping.

{¶ 57} Based on the foregoing, we find that the trial court did not err in holding that there was no verbal contract between the parties.

{¶ 58} Appellee's first assignment of error on cross-appeal is, therefore, overruled.

### First Assignment of Error on Appeal, Second Assignment of Error on Cross–Appeal

{¶ 59} Appellant, in his sole assignment of error, and appellee, in his second assignment of error on cross-appeal, both challenge the trial court's award of damages for unjust enrichment. While appellant contends that the trial court's finding that appellant had been unjustly enriched was against the manifest weight of the evidence and that the trial court erred in awarding damages of

$20,900, appellee contends that the trial court properly determined that appellant had been unjustly enriched but erred in awarding damages of only $20,900.

{¶ 60} A judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614 N.E.2d 742.

{¶ 61} In order to recover under a theory of unjust enrichment, a plaintiff must prove by a preponderance of the evidence: (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge of such benefit, and (3) the defendant was retaining that benefit under circumstances where it would be unjust for him to retain that benefit without payment. *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183, 12 OBR 246, 465 N.E.2d 1298. See also *Hummel v. Hummel* (1938), 133 Ohio St. 520, 525, 11 O.O. 221, 14 N.E.2d 923.

{¶ 62} Under Ohio law, unjust enrichment is a claim under quasi-contract law that arises out of the obligation cast by law upon a person in receipt of benefits that he is not justly entitled to retain. See *Beatley v. Beatley,* 160 Ohio App.3d 600, 2005-Ohio-1846, 828 N.E.2d 180. Unjust enrichment entitles a party only to restitution of the reasonable value of the benefit conferred. *St. Vincent Med. Ctr. v. Sader* (1995), 100 Ohio App.3d 379, 384, 654 N.E.2d 144.

{¶ 63} We concur with the trial court that appellee has established the elements of unjust enrichment by a preponderance of the evidence. There was testimony adduced at trial that appellee loaned appellant and Carey money to purchase the modular home and that when the house burned down before it was fully paid for, the insurance proceeds were used to replace the house on appellant's property. As noted by the trial court, appellant received the benefit of the house and had knowledge that such benefit was derived from appellee.

{¶ 64} Testimony was adduced at the trial that appellant owed $116,000 on the mortgage for the subject property. In addition, appellant testified that he paid $80,000 for the land in 1998. Based on the foregoing, we find that the trial court did not err in its decision to use $36,000 ($116,000—$80,000) as a starting point. It was reasonable for the trial court to conclude that the property and the structure thereon were worth at least $116,000 because the appellant was able to obtain a mortgage for that amount. If the land was worth $80,000, then the structure must be worth at least $36,000. This figure represents the value of the benefit that appellee conferred on appellant.

{¶ 65} The issue thus becomes the amount of damages to which appellee is entitled. The trial court, in its judgment entry in this case, found that appellant had paid a total of $5,100 between January 2003 (the date that the trial court found that appellant had attempted to borrow $30,000 to $40,000 to refinance) and September 2003 (when appellant made his last payment to appellee), and credited this amount against the $36,000, leaving a balance of $30,900. However, there is no evidence in the record that appellant attempted to borrow money to refinance in January 2003. As is noted above, following a hearing held in appellant's domestic-relations case in October 2002, the magistrate, in a decision filed on November 14, 2002, found that the date that appellant attempted to refinance was unclear. This finding was incorporated into the trial court's January 2, 2003 judgment entry in appellant's domestic-relations case, which was admitted as an exhibit in this case. Based on the fact that the hearing before the magistrate was held on October 28, 2002, it is clear that appellant's attempt to borrow the $30,000 to $40,000 occurred prior to that date. We find, therefore, that the trial court erred in only crediting appellant with the monthly payments he made to appellee between January of 2003 and September of 2003. We further find, however, that while appellant asserts that he should have been credited with the $600–per–month payments that he made to appellee in 2002, there is no evidence that appellant attempted to refinance earlier than October 2002. We find that the trial court should have also credited appellant for monthly payments that he made in October, November, and December 2002.

{¶ 66} However, we find that the trial court erred in crediting appellant with $10,000. As is stated above, the separation agreement entered into between appellant and Carey stated, under the heading "Real Estate," as follows: "Husband shall pay to the Wife the sum of $10,000.00 at the time the minor child * * * reaches the age of 18 years." The judgment entry/decree of divorce incorporating the same was filed on September 18, 2001. The trial court credited appellant with such amount, finding that appellant was not unjustly enriched with respect to the same because he had to eventually pay the $10,000 to Carey.

{¶ 67} As noted by appellee in his brief, the $10,000 payment "constitutes property settlement that [a]ppellant was required to pay his former spouse." It appears from reading the separation agreement that the $10,000 payable to Carey upon the child turning 18, could be for her interest in the equity in the real estate attributable to the structure built with her father's money. But it is not spelled out in the agreement. While appellant could have joined Carey as a party in the case sub judice, he failed to do so. We, therefore, find that the trial court erred in subtracting the $10,000 owed to Carey from the amount of appellant's total unjust enrichment. Appellant, at this point in time has been unjustly

enriched in the amount of $36,000 (minus payments), and appellee is entitled to be compensated now for that enrichment.

{¶ 68} Appellee, in his cross-appeal, maintains that the trial court should have awarded him $95,643 in damages. At the trial in this matter, appellee testified that the current balance on his own mortgage was $95,643. Appellee's exhibit at trial shows that, as of August 8, 2007, appellee owed Select Portfolio Servicing that amount. However, we concur with the trial court that appellee failed to prove that his inability to pay the mortgage on his own property and the resulting pending foreclosure on his own property was a direct and proximate result of appellant's failure to make any additional payments to him after September 2003. Testimony was adduced at trial that his mortgage was in default prior to that date and that appellee had prior liens filed against his property. Moreover, appellee further contends that appellant was obligated to pay him interest in the amount of 15.7346 percent, which is the amount of interest that appellee was paying on the $43,804 loan. However, as noted by the trial court, "[T]here is no showing in the evidence that [appellant] ever knew or was provided the interest rate or documents regarding the obligation entered into between [appellee] and his daughter * * * "

{¶ 69} Based on the foregoing, appellee's first assignment of error on cross-appeal is denied. Appellant's sole assignment of error and appellee's second assignment of error on cross-appeal are sustained in part.

{¶ 70} Accordingly, the judgment of the Guernsey County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to the trial court for further proceedings.

Judgment affirmed in part
and reversed in part,
and cause remanded.

HOFFMAN, P.J., and WISE, J., concur.